COPY

including by offsetting the refund against your future payouts. You agree that Airbnb's **Rebooking and Refund Policy**, **Extenuating Circumstances Policy,** and these Terms preempt the cancellation policy you set in situations where they allow for the cancellation of a Reservation and/or the issuance of refunds to Guests. If we reasonably expect to provide a refund to a Guest under one of these policies, we may delay release of any payout for that Reservation until a refund decision is made. If you Host an Experience please note that the **Experience Cancellation Policy**, **Experiences Guest Refund Policy** and different **cancellation fees and consequences** apply to your Reservations. See each **Policy** for details about what is covered, and what your payout will be in each situation. You may appeal a decision by Airbnb by contacting our **customer service**.

**7.2 Booking Modifications**. Hosts and Guests are responsible for any Booking Modifications they agree to make via the Airbnb Platform or direct Airbnb customer service to make on their behalf, and agree to pay any additional amounts, fees or taxes associated with a Booking Modification.

**8. Taxes**.

**8.1 Host Taxes**. As a Host, you are responsible for determining and fulfilling your obligations under applicable laws to report, collect, remit or include in your price any applicable VAT or other indirect taxes, occupancy taxes, tourist, income or other taxes ("**Taxes**").

**8.2 Collection and Remittance by Airbnb**. In jurisdictions where Airbnb facilitates the collection and/or remittance of Taxes on behalf of Hosts, you instruct and authorize Airbnb to collect Taxes on your behalf, and/or to remit such Taxes to the relevant Tax authority. Any Taxes that are collected and/or remitted by Airbnb are identified to Members on their transaction records, as applicable. Airbnb may seek additional amounts from Members (including by deducting such amounts from future payouts) in the event that the Taxes collected and/or remitted are insufficient to fully discharge that Members' tax obligations, and you agree that your sole remedy for Taxes collected by Airbnb is a refund from the applicable Tax authority. You acknowledge and agree that we retain the right, with prior notice to affected Members, to cease the collection and remittance of Taxes in any jurisdiction for any reason.

**8.3 Tax Information**. In certain jurisdictions, Tax regulations may require that we collect and/or report Tax information about you, or withhold Taxes from payouts to you, or both. If you fail to provide us with documentation that we determine to be sufficient to support any such obligation to withhold Taxes from payouts to you, we may withhold payouts up to the amount as required by law, until sufficient documentation is provided. You agree that Airbnb may issue on your behalf invoices or similar documentation for

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

VAT, GST, consumption or other Taxes for your Host Services to facilitate accurate tax reporting by our Guests and their organizations.

# General Terms

**9. Reviews**.

After each Host Service, Guests and Hosts will have an opportunity to review each other. Your Review must be accurate and may not contain any discriminatory, offensive, defamatory, or other language that violates our **Content Policy** or **Review Policy**. Reviews are not verified by Airbnb for accuracy and may be incorrect or misleading.

**10. Content**.

Parts of the Airbnb Platform enable you to provide feedback, text, photos, audio, video, information and other content ("**Content**"). By providing Content, in whatever form and through whatever means, you grant Airbnb a non-exclusive, worldwide, royalty-free, sub-licensable and transferable license, for the term of the protection of the rights so licensed, to access, use, store, copy, modify, prepare derivative works of, distribute, publish, transmit, stream, broadcast, and otherwise exploit in any manner such Content to provide and/or promote the Airbnb Platform, in any media or platform, known or unknown to date and in particular on Internet and social networks. If Content includes personal information, such Content will only be used for these purposes if such use complies with applicable data protection laws in accordance with our **Privacy Policy**. Where Airbnb pays for the creation of Content or facilitates its creation, Airbnb may own that Content, in which case supplemental terms or disclosures will say that. You are solely responsible for all Content that you provide and warrant that you either own it or are authorized to grant Airbnb the rights described in these Terms. You are responsible and liable if any of your Content violates or infringes the intellectual property or privacy rights of any third party. Content must comply with our **Content Policy** and **Nondiscrimination Policy**, which prohibit, among other things, discriminatory, obscene, harassing, deceptive, violent and illegal content. You agree that Airbnb may make available services or automated tools to translate Content and that your Content may be translated using such services or tools. Airbnb does not guarantee the accuracy or quality of translations and Members are responsible for confirming the accuracy of such translations.

**11. Fees**.

Airbnb may charge fees (and applicable Taxes) to Hosts and Guests for the right to use the Airbnb Platform. Any applicable fees are disclosed to Hosts before publishing a

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

listing and to Guests before making a booking. More information about when service fees apply and how they are calculated can be found on our **Service Fees page**. Except as otherwise provided on the Airbnb Platform, service fees are non-refundable.

**12. Airbnb Platform Rules**.

**12.1 Rules**. You must follow these rules and must not help or induce others to break or circumvent these rules.

- Act with integrity and treat others with respect
  - Do not lie, misrepresent something or someone, or pretend to be someone else.

  - Be polite and respectful when you communicate or interact with others.

  - Follow our **Nondiscrimination Policy** and do not discriminate against or harass others.

- Do not scrape, hack, reverse engineer, compromise or impair the Airbnb Platform
  - Do not use bots, crawlers, scrapers or other automated means to access or collect data or other content from or otherwise interact with the Airbnb Platform.

  - Do not hack, avoid, remove, impair, or otherwise attempt to circumvent any security or technological measure used to protect the Airbnb Platform or Content.

  - Do not decipher, decompile, disassemble or reverse engineer any of the software or hardware used to provide the Airbnb Platform.

  - Do not take any action that could damage or adversely affect the performance or proper functioning of the Airbnb Platform.

- Only use the Airbnb Platform as authorized by these Terms or another agreement with us
  - You may only use another Member's personal information as necessary to facilitate a transaction using the Airbnb Platform as authorized by these Terms.

  - Do not use the Airbnb Platform, our messaging tools, or Members' personal information to send commercial messages without their express consent.

  - You may use Content made available through the Airbnb Platform solely as necessary to enable your use of the Airbnb Platform as a Guest or Host.

- Do not use Content unless you have permission from the Content owner or the use is authorized by us in these Terms or another agreement you have with us.

- Do not request, make or accept a booking or any payment outside of the Airbnb Platform to avoid paying fees, taxes or for any other reason. See our **Offline Fee Policy** for exceptions.

- Do not require or encourage Guests to open an account, leave a review, or otherwise interact, with a third party website, application or service before, during or after a reservation, unless authorized by Airbnb.

- Do not engage in any practices that are intended to manipulate our search algorithm.

- Do not book Host Services unless you are actually using the Host Services.

- Do not use, copy, display, mirror or frame the Airbnb Platform, any Content, any Airbnb branding, or any page layout or design without our consent.

- Honor your legal obligations
    - Understand and follow the laws that apply to you, including privacy, data protection, and export laws.

    - If you provide us with someone else's personal information, you: (i) must do so in compliance with applicable law, (ii) must be authorized to do so, and (iii) authorize us to process that information under our **Privacy Policy**.

    - Read and follow our Terms, **Additional Legal Terms**, **Policies** and **Standards**.

    - Do not organize or facilitate unauthorized parties or events. You are responsible and liable for any party or event during your reservation that violates our **rules for parties and events**, as incorporated by reference herein.

    - Do not use the name, logo, branding, or trademarks of Airbnb or others without permission, and only as set forth in our **Trademark Guidelines**.

    - Do not use or register any domain name, social media handle, trade name, trademark, branding, logo or other source identifier that may be confused with Airbnb branding.

    - Do not offer Host Services that violate the laws or agreements that apply to you.

- Do not offer or solicit prostitution or participate in or facilitate human trafficking.

**12.2 Reporting Violations**. If you believe that a Member, Listing or Content poses an imminent risk of harm to a person or property, you should immediately contact local authorities before contacting Airbnb. In addition, if you believe that a Member, Listing or Content has violated our **Standards**, you should report your concerns to Airbnb. If you reported an issue to local authorities, Airbnb may request a copy of that report. Except as required by law, we are not obligated to take action in response to any report.

**12.3 Copyright Notifications**. If you believe that Content on the Airbnb Platform infringes copyrights, please notify us in accordance with our **Copyright Policy**.

**13. Termination, Suspension and other Measures**.

**13.1 Term**. The agreement between you and Airbnb reflected by these Terms remains in effect until either you or we terminate the agreement in accordance with these Terms.

**13.2 Termination**. You may terminate this agreement at any time by sending us an email or by deleting your account. Airbnb may terminate this agreement for any reason by giving you 30 days' notice via email or using any other contact information you have provided for your account. Airbnb may also terminate this agreement immediately and without prior notice and stop providing access to the Airbnb Platform if (i) you materially breach these Terms or our **Additional Legal Terms**, or **Policies**, (ii) you violate applicable laws, or (iii) such action is necessary to protect the personal safety or property of Airbnb, its Members, or third parties (for example in the case of fraudulent behavior of a Member), or (iv) your account has been inactive for more than two years.

**13.3 Member Violations**. If (i) you breach these Terms, our **Additional Legal Terms**, **Policies**, or our **Standards**, (ii) you violate applicable laws, regulations or third party rights, (iii) you have repeatedly received poor Reviews or Airbnb otherwise becomes aware of or has received complaints about your performance or conduct, (vi) you have repeatedly cancelled confirmed bookings or failed to respond to booking requests without a valid reason, or (vii) such action is necessary to protect the personal safety or property of Airbnb, its Members, or third parties, Airbnb may:

- suspend or limit your access to or use of the Airbnb Platform and/or your account;

- suspend or remove Listings, Reviews, or other Content;

- cancel pending or confirmed bookings; or

- suspend or revoke any special status associated with your account.

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

In case of non-material violations or where otherwise appropriate, you will be given notice of any intended measure by Airbnb and an opportunity to resolve the issue, unless such notification would (i) prevent or impede the detection or prevention of fraud or other illegal activities, (ii) harm the legitimate interests of other Members or third parties, or (iii) contravene applicable laws.

**13.4 Legal Mandates**. Airbnb may take any action it determines is reasonably necessary to comply with applicable law, or the order or request of a court, law enforcement or other administrative agency or governmental body, including the measures described above in Section 13.3.

**13.5 Effect of Termination**. If you are a Host and terminate your Airbnb account, any confirmed booking(s) will be automatically cancelled and your Guests will receive a full refund. If you terminate your account as a Guest, any confirmed booking(s) will be automatically cancelled and any refund will depend upon the terms of the Listing's cancellation policy. When this agreement has been terminated, you are not entitled to a restoration of your account or any of your Content. If your access to or use of the Airbnb Platform has been limited, or your Airbnb account has been suspended, or this agreement has been terminated by us, you may not register a new account or access or use the Airbnb Platform through an account of another Member.

**13.6 Appeal**. If Airbnb takes any of the measures described in this Section 13 you may appeal such a decision by contacting our **customer service**.

## 14. Modification of these Terms.

When we propose changes to these Terms, we will post the revised Terms on the Airbnb Platform and update the "Last Updated" date at the top of these Terms. We will provide you with notice of the proposed changes by email at least thirty (30) days before the date they become effective. If the proposed changes to these Terms are material, you will be asked to explicitly accept the revised Terms. Such notice will also inform you about your right to reject the proposed changes, the timeframe to do so, and your right to terminate the Agreement at any time before the effective date of the proposed changes as provided in these Terms. In case of (i) non-material changes to these Terms which do not affect its essential provisions, in particular, provisions defining the nature and scope of the services provided by Airbnb, or (ii) changes that are required by law, a legally binding court decision, or binding order of a competent authority, your continued use of the Airbnb Platform after the effective date of the proposed changes will constitute acceptance of the revised Terms.

## 15. Resolving Complaints and Damage Claims.

COPY

15.1 If a Member provides valid evidence that you, your guest(s), or your pet(s) culpably damaged the complaining Member's real or personal property, or real or personal property the complaining Member is responsible for, including consequential damages, ("Damage Claim"), the complaining Member can notify Airbnb and/or seek compensation through the **Resolution Center**. You will be notified of the Damage Claim and given an opportunity to respond. If you agree to pay, you authorize Airbnb via Airbnb Payments to collect the amount of the Damage Claim from you.

15.2 If the Host and Guest cannot resolve, or a Guest fails to pay a Damage Claim, the Host may notify Airbnb through the **Resolution Center** under the terms of the Host Damage Protection Terms and seek compensation. Airbnb will review the Damage Claim and ask the Host to provide any required evidence (e.g. through appropriate documents, photos, invoices, or third-party experts) which substantiates the Damage Claim and the Damage Claim amount. The Guest will be given the opportunity to respond and provide any relevant counter evidence. If Airbnb determines, under consideration of the evidence provided, the Host Damage Protection Terms, and applicable statutory rules on the burden of proof that the Guest is responsible for the Damage Claim, Airbnb (via Airbnb Payments) will pay out the Damage Claim to the Host. If Airbnb pays out the Damage Claim to the Host, Airbnb may collect the amount of the Damage Claim from the Guest, including by charging the guest's Payment Method up to a maximum amount of $500 USD. Airbnb may also pursue claims for recovering Damage Claims amounts, including amounts exceeding the maximum amount applicable for charging the Guest's Payment Method, against a Guest using any remedies it may have available under applicable law, including referral of the matter to a collections agency, and/or pursuit of available causes of action and/or claims against a Guest. Members may appeal a decision by Airbnb by contacting our **customer service**. As between Members and Airbnb, the burden of proof regarding the Damage Claim and the Damage Claim amount always lies with Airbnb.

15.3 You agree to cooperate in good faith, provide any information Airbnb requests, execute documents, and take further reasonable action, in connection with Damage Claims, Member complaints, claims under insurance policies, or other claims related to your provision or use of Host Services.

15.4  Any decisions made by Airbnb in relation to a Damage Claim do not affect your contractual and statutory rights. Your right to take legal action before a court of law remains unaffected.

**16. Airbnb's Role**.

We offer you the right to use a platform that enables Members to publish, offer, search for, and book Host Services. When Members make or accept a booking, they are

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

Exhibit A
43/55

COPY

entering into a contract directly with each other. Airbnb is not and does not become a party to or other participant in any contractual relationship between Members. Airbnb is not acting as an agent for any Member except for where Airbnb Payments acts as a collection agent as provided in the Payments Terms. While we work hard to ensure our Members have great experiences using Airbnb, we do not and cannot control the conduct or performance of Guests and Hosts and do not guarantee (i) the existence, quality, safety, suitability, or legality of any Listings or Host Services or (ii) the truth or accuracy of any Listing descriptions, Reviews, or other Content provided by Members. You acknowledge that Airbnb has no general obligation to monitor the use of the Airbnb Platform and verify information provided by our Members, but has the right to review, disable access to, remove, or edit Content to: (i) operate, secure and improve the Airbnb Platform (including for fraud prevention, risk assessment, investigation and customer support purposes); (ii) ensure Members' compliance with these Terms; (iii) comply with applicable law or the order or requirement of a court, law enforcement or other administrative agency or governmental body; (iv) address Member Content that we determine is harmful or objectionable; (v) take actions set out in these Terms; and (vi) maintain and enforce any quality or eligibility criteria, including by removing Listings that don't meet quality and eligibility criteria. Where we remove or disable Content, we will notify a Member and provide the reasons for such a measure, unless such notification would (i) prevent or impede the detection or prevention of fraud or other illegal activities, (ii) harm the legitimate interests of other Members or third parties, or (iii) contravene applicable laws. You may appeal such a decision by contacting our **customer service**. Members agree to cooperate with and assist Airbnb in good faith, and to provide Airbnb with such information and take such actions as may be reasonably requested by Airbnb with respect to any investigation undertaken by Airbnb regarding the use or abuse of the Airbnb Platform.

### 17. Member Accounts.

You must register an account to access and use many features of the Airbnb Platform. Registration is only permitted for legal entities, partnerships and natural persons who are 18 years or older. You represent and warrant that you are not a person or entity barred from using the Airbnb Platform under the laws of the United States, your place of residence, or any other applicable jurisdiction. You must provide accurate, current, and complete information during registration and keep your account information up-to-date. You may not register more than one account or transfer your account to someone else. You are responsible for maintaining the confidentiality and security of your account credentials and may not disclose your credentials to any third party. You must immediately notify Airbnb if you suspect that your credentials have been lost, stolen, or your account is otherwise compromised. You are responsible and liable for activities conducted through your Airbnb Account, unless such activities are not authorized by

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

you and you are not otherwise negligent (such as failing to report the unauthorized use or loss of your credentials). If and as permitted by applicable law, we may, but have no obligation to (i) ask you to provide identification or other information, (ii) undertake checks designed to help verify your identity or background, (iii) screen you against third-party databases or other sources and request reports from service providers, and (iv) obtain reports from public records of criminal convictions or sex offender registrations or their local equivalents.

### 18. Disclaimer.

**We do not endorse or warrant the existence, conduct, performance, safety, quality, legality or suitability of any Guest, Host, Host Service, Listing or third party and we do not warrant that verification, identity or background checks conducted on Members (if any) will identify past misconduct or prevent future misconduct. Any references to a Member being "verified" (or similar language) indicate only that the Member or Airbnb has completed a relevant verification or identification process and nothing else. We are not responsible for outages or disruptions of the Internet and telecommunications infrastructure which are beyond our control and can lead to interruptions in the availability of the Airbnb Platform. Airbnb may, temporarily and under consideration of the Members' legitimate interests (e.g. by providing prior notice), restrict the availability of the Airbnb Platform or certain features thereof, if this is necessary in view of capacity limits, the security or integrity of our servers, or to carry out maintenance measures that ensure the proper or improved functioning of the Airbnb Platform.**

### 19. Liability.

Airbnb is liable under statutory provisions for intent and gross negligence by us, our legal representatives, directors, or other vicarious agents. The same applies to the assumption of guarantees or any other strict liability, or in case of a culpable injury to life, limb, or health. For any negligent breaches of essential contractual obligations by us, our legal representatives, directors, or other vicarious agents Airbnb's liability is limited to the typically occurring foreseeable damages. Essential contractual obligations are such duties of Airbnb in whose proper fulfillment you regularly trust and must trust for the proper execution of the contract. Any additional liability of Airbnb is excluded. To the extent that Airbnb's liability is excluded or limited, this also applies with regards to the personal liability of its legal representatives, directors, employees, and other agents.

### 20. Indemnification.

**To the maximum extent permitted by applicable law, you agree to release, defend (at Airbnb's option), indemnify, and hold Airbnb (including Airbnb Payments, other**

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

**affiliates, and their personnel) harmless from and against any claims, liabilities, damages, losses, and expenses, including, without limitation, reasonable legal and accounting fees, arising out of or in any way connected with: (i) your breach of these Terms (including any supplemental or additional terms that apply to a product or feature) or our**

**Additional Legal Terms, Policies, or Standards, (ii) your improper use of the Airbnb Platform, (iii) your interaction with any Member, stay at an Accommodation, participation in an Experience or other Host Service, including without limitation any injuries, losses or damages (whether compensatory, direct, incidental, consequential or otherwise) of any kind arising in connection with or as a result of such interaction, stay, participation or use, (iv) your failure, or our failure at your direction, to accurately report, collect or remit Taxes, or (v) your breach of any laws, regulations or third party rights such as intellectual property or privacy rights. The indemnification obligation only applies if and to the extent that the claims, liabilities, damages, losses, and expenses have been adequately caused by your culpable breach of a contractual obligation.**

## 21. Contracting Entities.

Based on your country of residence or establishment and what you are doing on the Airbnb Platform, Schedule 1 below sets out the Airbnb entity with whom you are contracting. If we identify through the Airbnb Platform, an Airbnb entity other than the one set out on Schedule 1 as being responsible for a product, feature or transaction, the Airbnb entity so identified is your contracting entity with respect to that product, feature or transaction. If you change your country of residence or establishment to a country outside of the EEA, Switzerland or the United Kingdom, the Airbnb company you contract with and the applicable version of the Terms of Service will be determined by your new country of residence or establishment, from the date on which your country of residence or establishment changes.

## 22. Applicable law and Jurisdiction.

These Terms are governed by and construed in accordance with Irish law. If you are acting as a consumer and if mandatory statutory consumer protection regulations in your country of residence contain provisions that are more beneficial for you, such provisions shall apply irrespective of the choice of Irish law. As a consumer, you may bring any judicial proceedings relating to these Terms before the competent court of your place of residence or the competent court of Airbnb's place of business in Ireland. If Airbnb wishes to enforce any of its rights against you as a consumer, we may do so only in the courts of the jurisdiction in which you are a resident. If you are acting as a business, you agree to submit to the exclusive jurisdiction of the Irish courts.

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

**23. Miscellaneous**.

**23.1 Other Terms Incorporated by Reference**. Our <u>Host Damage Protection</u>, <u>Japan Host Insurance Terms</u>, <u>Rebooking and Refund Policy</u>, <u>Experiences Guest Refund Policy</u>, <u>Content Policy</u>, <u>Nondiscrimination Policy</u>, <u>Extenuating Circumstances Policy</u>, <u>Additional Legal Terms</u>, <u>Policies</u>, <u>Standards</u> and other supplemental policies and terms linked to in these Terms apply to your use of the Airbnb Platform, are incorporated by reference, and form part of your agreement with Airbnb.

**23.2 Interpreting these Terms**. Except as they may be supplemented by additional terms, conditions, policies, guidelines, standards, and in-product disclosures, these Terms constitute the entire agreement between Airbnb and you pertaining to your access to or use of the Airbnb Platform and supersede any and all prior oral or written understandings or agreements between Airbnb and you. These Terms do not and are not intended to confer any rights or remedies upon anyone other than you and Airbnb. If any provision of these Terms is held to be invalid or unenforceable, except as otherwise indicated in Section 24.11 below, such provision will be struck and will not affect the validity and enforceability of the remaining provisions.

**23.3 No Waiver**. Airbnb's failure to enforce any right or provision in these Terms will not constitute a waiver of such right or provision unless acknowledged and agreed to by us in writing. Except as expressly set forth in these Terms, the exercise by either party of any of its remedies under these Terms will be without prejudice to its other remedies under these Terms or otherwise permitted under law.

**23.4 Assignment**. You may not assign, transfer or delegate this agreement or your rights and obligations hereunder without Airbnb's prior written consent. Airbnb may without restriction assign, transfer or delegate this agreement and any rights and obligations hereunder, at its sole discretion, with 30 days' prior notice. Your right to terminate this agreement at any time pursuant to Section 13.2 remains unaffected.

**23.5 Notice**. Unless specified otherwise, any notices or other communications to Members permitted or required under this agreement, will be provided electronically and given by Airbnb via email, Airbnb Platform notification, messaging service (including SMS and WeChat), or any other contact method we enable you to provide. If a notification relates to a booking or Listing in Japan, you agree and acknowledge that such notifications via electronic means in lieu of a written statement, satisfies Airbnb's obligations under Article 59 (1) of the Japanese Housing Accommodation Business Act.

**23.6 Third-Party Services**. The Airbnb Platform may contain links to third-party websites, applications, services or resources (“**Third-Party Services**”) that are subject to different terms and privacy practices. Airbnb is not responsible or liable for any aspect

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

of such Third-Party Services and links to such Third-Party Services are not an endorsement.

**23.7 Google Terms**. Some translations on the Airbnb Platform are powered by Google. Google disclaims all warranties related to the translations, express or implied, including any warranties of accuracy, reliability, and any implied warranties for merchantability, fitness for a particular purpose and non-infringement. Some areas of the Airbnb Platform implement Google Maps/Earth mapping services, including Google Maps API(s). Your use of Google Maps/Earth is subject to the **Google Maps/Google Earth Additional Terms of Service**.

**23.8 Apple Terms**. If you access or download our application from the Apple App Store, you agree to **Apple's Licensed Application End User License Agreement**.

**23.9 Airbnb Platform Content**. Content made available through the Airbnb Platform may be protected by copyright, trademark, and/or other laws of the United States and other countries. You acknowledge that all intellectual property rights for that Content are the exclusive property of Airbnb and/or its licensors and agree that you will not remove, alter or obscure any copyright, trademark, service mark or other proprietary rights notices. You may not use, copy, adapt, modify, prepare derivative works of, distribute, license, sell, transfer, publicly display, publicly perform, transmit, broadcast or otherwise exploit any Content accessed through the Airbnb Platform except to the extent you are the legal owner of that Content or as expressly permitted in these Terms. Subject to your compliance with these Terms, Airbnb grants you a limited, non-exclusive, non-sublicensable, revocable, non-transferable license to (i) download and use the Application on your personal device(s); and (ii) access and view the Content made available on or through the Airbnb Platform and accessible to you, solely for your personal and non-commercial use.

**23.10 Airbnb.org**. Airbnb.org is a nonprofit corporation exempt from income taxation under U.S. Internal Revenue Code Section 501(c)(3), operating as a public charity. Airbnb.org is not owned or controlled by Airbnb. Airbnb.org administers a number of charitable programs that benefit our Host and Guest communities and the public.

**23.11 Force Majeure**. Airbnb shall not be liable for any delay or failure to perform resulting from causes outside its reasonable control, including, but not limited to, acts of God, war, terrorism, riots, embargoes, acts of civil or military authorities, fire, floods, accidents, epidemics or disease, strikes or shortages of transportation facilities, fuel, energy, labor or materials.

**23.12 Emails and SMS**. You will receive administrative communications from us using the email address or other contact information you provide for your Airbnb account.

COPY

Enrollment in additional email subscription programs will not affect the frequency of these administrative emails, though you should expect to receive additional emails specific to the program(s) to which you have subscribed. You may also receive promotional emails from us. No fee is charged for these promotional emails, but third-party data rates could apply. You can control whether you receive promotional emails using the notification preferences in your account settings. Please note that you will not be able to take advantage of certain promotions if you disable certain communication settings or do not have an Airbnb Account. In the U.S. if you consent to receive SMS (text messages) from us, you will be subject to our **SMS Terms**.

**23.13 Contact Us**. If you have any questions about these Terms please **email us**.

**24. United States Dispute Resolution and Arbitration Agreement**.

**24.1 Application**. This Arbitration Agreement only applies to you if your country of residence or establishment is the United States. If your country of residence or establishment is not the United States, and you nevertheless attempt to bring any legal claim against Airbnb in the United States, this Arbitration Agreement will apply for determination of the threshold issue of whether this Section 24 applies to you, and all other threshold determinations, including residency, arbitrability, venue, and applicable law.

**24.2 Overview of Dispute Resolution Process**. Airbnb is committed to participating in a consumer-friendly dispute resolution process. To that end, these Terms provide for a two-part process for individuals to whom this Section 24 applies: (1) an informal negotiation directly with Airbnb's customer service team (described in paragraph 24.3, below), and if necessary (2) a binding arbitration administered by the American Arbitration Association ("**AAA**"). You and Airbnb each retain the right to seek resolution of the dispute in small claims court as an alternative to arbitration.

**24.3 Mandatory Pre-Arbitration Dispute Resolution and Notification**. At least 30 days prior to initiating an arbitration, you and Airbnb each agree to notify the other party of the dispute in writing and attempt in good faith to negotiate an informal resolution. You must send your notice of dispute to Airbnb by mailing it to Airbnb's agent for service: **CSC Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833**. Airbnb will send its notice of dispute to the email address associated with your Airbnb account. A notice of dispute must include: the party's name and preferred contact information, a brief description of the dispute, and the relief sought. If the parties are unable to resolve the dispute within the 30-day period, only then may either party commence arbitration by filing a written Demand for Arbitration (available at **www.adr.org**) with the AAA and providing a copy to the other party as specified in the AAA Rules (available at **www.adr.org**).

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

**24.4 Agreement to Arbitrate**. **You and Airbnb mutually agree that any dispute, claim or controversy arising out of or relating to these Terms or the applicability, breach, termination, validity, enforcement or interpretation thereof, or any use of the Airbnb Platform, Host Services, or any Content (collectively, "**Disputes**") will be settled by binding individual arbitration (the "**Arbitration Agreement**"). If there is a dispute about whether this Arbitration Agreement can be enforced or applies to our Dispute, you and Airbnb agree that the arbitrator will decide that issue.**

**24.5 Exceptions to Arbitration Agreement**. You and Airbnb each agree that the following causes of action and/or claims for relief are exceptions to the Arbitration Agreement and will be brought in a judicial proceeding in a court of competent jurisdiction (as defined by Section 22 of the Terms of Service for Non-European Users): (i) any claim or cause of action alleging actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights; (ii) any claim or cause of action seeking emergency injunctive relief based on exigent circumstances (e.g., imminent danger or commission of a crime, hacking, cyber-attack); or (iii) a request for the remedy of public injunctive relief; or (iv) any individual claim of sexual assault or sexual harassment arising from your use of the Airbnb Platform or Host Services. You and Airbnb agree that the remedy of public injunctive relief will proceed after the arbitration of all arbitrable claims, remedies, or causes of action, and will be stayed pending the outcome of the arbitration pursuant to section 3 of the Federal Arbitration Act.

**24.6 Arbitration Rules and Governing Law**. This Arbitration Agreement evidences a transaction in interstate commerce and the Federal Arbitration Act governs all substantive and procedural interpretation and enforcement of this provision. The arbitration will be administered by the arbitrator in accordance with the Consumer Arbitration Rules and/or other AAA arbitration rules determined to be applicable by the AAA (the "**AAA Rules**") then in effect, except as modified here. The AAA Rules are available at **www.adr.org**. In order to initiate arbitration, a completed written demand (available at **www.adr.org**) must be filed with the AAA and provided to the other party, as specified in the AAA rules.

**24.7 Modification to AAA Rules - Arbitration Hearing/Location**. In order to make the arbitration most convenient to you, Airbnb agrees that any required arbitration hearing may be conducted, at your option: (a) in the U.S. county where you reside; (b) in San Francisco County; (c) via phone or video conference. If the amount in controversy is $5,000 or less, the parties agree to proceed solely on the submission of documents to the arbitrator.

**24.8 Modification of AAA Rules - Attorney's Fees and Costs**. Your arbitration fees and your share of arbitrator compensation shall be governed by the AAA Rules. Either party

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

may make a request that the arbitrator award attorneys' fees and costs upon proving that the other party has asserted a claim, cross-claim or defense that is groundless in fact or law, brought in bad faith or for the purpose of harassment, or is otherwise frivolous, as allowed by applicable law and the AAA Rules.

**24.9 Arbitrator's Decision**. The arbitrator's decision will include the essential findings and conclusions upon which the arbitrator based the award. Judgment on the arbitration award may be entered in any court with proper jurisdiction. The arbitrator may award any relief allowed by law or the AAA Rules, but declaratory or injunctive relief may be awarded only on an individual basis and only to the extent necessary to provide relief warranted by the claimant's individual claim.

**24.10 Jury Trial Waiver**. You and Airbnb acknowledge and agree that we are each waiving the right to a trial by jury as to all arbitrable Disputes.

**24.11 No Class Actions or Representative Proceedings**. You and Airbnb acknowledge and agree that, to the fullest extent permitted by law, we are each waiving the right to participate as a plaintiff or class member in any purported class action lawsuit, class-wide arbitration, private attorney general action, or any other representative or consolidated proceeding. Unless we agree in writing, the arbitrator may not consolidate more than one party's claims and may not otherwise preside over any form of any class or representative proceeding. If there is a final judicial determination that applicable law precludes enforcement of the waiver contained in this paragraph as to any claim, cause of action or requested remedy, then that claim, cause of action or requested remedy, and only that claim, cause of action or requested remedy, will be severed from this agreement to arbitrate and will be brought in a court of competent jurisdiction. In the event that a claim, cause of action or requested remedy is severed pursuant to this paragraph, then you and we agree that the claims, causes of action or requested remedies that are not subject to arbitration will be stayed until all arbitrable claims, causes of action and requested remedies are resolved by the arbitrator.

**24.12 Severability**. Except as provided in Section 24.11, in the event that any portion of this Arbitration Agreement is deemed illegal or unenforceable, such provision will be severed and the remainder of the Arbitration Agreement will be given full force and effect.

**24.13 Changes to Agreement to Arbitrate**. If Airbnb changes this Section 24 after the date you last accepted these Terms (or accepted any subsequent changes to these Terms), you may reject that change by sending us written notice (including by email) within 30 days of the date the change is effective. Rejecting a new change, however, does not revoke or alter your prior consent to any earlier agreements to arbitrate any Dispute between you and Airbnb (or your prior consent to any subsequent changes

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

thereto), which will remain in effect and enforceable as to any Dispute between you and Airbnb.

**24.14 Survival**. Except as provided in Section 24.12, and subject to Section 13.6 of the Terms of Service for Non-European Users this Section 24 will survive any termination of these Terms and will continue to apply even if you stop using the Airbnb Platform or terminate your Airbnb Account.

# Additional Terms Applicable to Business Users

If you are a **Business User** as defined in Section 25 of these Terms, the following additional terms will apply to you:

**25. Business Users**.

You are a "**Business User**" for the purposes of these Terms if (i) your place of residence or establishment is within the EEA or the United Kingdom, (ii) you fully meet the definition of a 'business user' outlined in Article 2 (1) of <u>Regulation (EU) 2019/1150 on promoting fairness and transparency for business users of online intermediation services</u> ("**Platform to Business Regulation**"), and (iii) you have notified Airbnb that you are a Business User by adding your business details to your Airbnb account. You are responsible for keeping your business details accurate and up to date.

**26. Termination, Suspension and other Measures.**

In case we take any of the measures according to Section 13.2 and 13.3, you will be given the opportunity to clarify the facts and circumstances leading to such a measure in the framework of our internal complaint-handling process as described in Section 27.

**27. Complaints Handling and Mediation.**

We want to be transparent about how we handle complaints and aim to treat all Business Users fairly. Our <u>Help Center</u> explains how you can access our internal complaint-handling system and what you can expect as a Business User when you make a complaint in relation to issues falling under the remit of Article 11 (1) of the Platform to Business Regulation. It also sets out the details of the mediation service that you can use in the event that such a complaint is not resolved.

**28. Access to Data.**

Business Users have access to personal and other data in their Airbnb account and host dashboard which is provided by the Business User, their Guests or generated through the use of the Airbnb Platform and which is necessary for the performance of their Host

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

Services as well as aggregated information about searches, bookings and the performance of their listings. Our **Privacy Policy** sets out the categories of personal data and other data we collect, how we use, process, disclose and retain it, and how you can access it and exercise your data rights.

## 29. Additional Distribution Channels.

Airbnb operates an affiliate program through which Listings may be featured on third party websites, such as those for online travel sites, media outlets, loyalty programs, and search aggregators. Listings may also appear in advertisements for Airbnb published on third party websites from time to time.

## Schedule 1 - Contracting Entities

| YOUR PLACE OF RESIDENCE OR ESTABLISHMENT: | YOUR ACTIVITY ON THE AIRBNB PLATFORM: | AIRBNB CONTRACTING ENTITY: | CONTACT INFORMATION: |
|---|---|---|---|
| **European Economic Area, Switzerland or the United Kingdom** | Booking or offering certain hotels or traditional accommodations, where Airbnb Travel, LLC is identified in the checkout or listing process. | Airbnb Travel, LLC | 888 Brannan Street, San Francisco, CA 94103, United States |
| | Booking or offering accommodations located in the United States for stays of 28 nights or more where Airbnb Stays, Inc. is identified in the checkout or listing process. | Airbnb Stays, Inc. | 888 Brannan Street, San Francisco, CA 94103, United States |
| | All other activities. | Airbnb Ireland UC | 8 Hanover Quay, |

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

Dublin 2,
Ireland

# Related articles

### About the updates to our Terms

Please review this information about updates to our Terms.

**Guest**

### Payment methods accepted

We support different payment methods depending on the country your payment account is located in.

### Find your payment

You can find your upcoming and completed payments in Your payments. This includes payments you've made for Homes and Experiences reservation...

**Support**

Help Center

AirCover

Supporting people with disabilities

Cancellation options

Our COVID-19 Response

Report a neighborhood concern

**Community**

Airbnb.org: disaster relief housing

Combating discrimination

**Hosting**

Airbnb your home

AirCover for Hosts

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

Explore hosting resources

Visit our community forum

How to host responsibly

Airbnb-friendly apartments

---

**Airbnb**

Newsroom

Learn about new features

Letter from our founders

Careers

Investors

Gift cards

---

🌐 English (US)   $ USD

© 2023 Airbnb, Inc.

Terms · Sitemap · Privacy · Your Privacy Choices ⊘✕

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

# EXHIBIT 1

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

**To commence the statutory time period
For appeals as of right (CPLR § 5513[a]),
you are advised to serve a copy of this
order, with notice of entry,
upon all parties.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
--------------------------------------------------------------------------X
ROCHELLE FOSTER

                                    *Plaintiff,*

                                                            **DECISION AND ORDER**

            -*against*-
                                                            Index No. EF006810-2022

ZOYA VOLKOV, VITALY VOLKOV, GARY VOLKOV,
and AIRBNB, INC.

                                    *Defendant.*
--------------------------------------------------------------------------X
*Hon. Elena Goldberg-Velazquez, J.S.C.*

The following papers, numbered 1 -3, were considered in connection with Defendant

AIRBNB, INC.'s Notice of Motion for an Order, pursuant to *Civil Practice Law and Rules* §§

3211(a)(7) and (a)(8), dismissing plaintiff's complaint and all claims asserted against Defendant

AIRBNB, INC., and granting such other and further relief as the Court deems just, proper and

equitable:

**PAPERS**                                                              **NUMBERED**

Notice of Motion/Memorandum of Law in Support/Affirmation of
Jared L. Limbach, Esq./Exhibits A- G                                         1

Affirmation of H. Bruce Fisher, Esq. in Opposition/Exhibit A                 2

Reply Brief in Further Support of AIRBNB's Motion to Dismiss/Exhibit A/
Affidavit of Katherine Brockman                                             3

1

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

Upon the foregoing papers, the Court now rules as follows:

Plaintiff commenced the instant action by filing a Summons and Verified Complaint on November 30, 2022. Plaintiff submitted Affidavits of Service as to Defendants ZOYA VOLKOV and GARY VOLKOV indicating they were served on December 19, 2022, at 333 Westview Avenue Fort Lee, New Jersey 07024 pursuant to *Civil Practice Law and Rules* § 308(2) by service of co-Defendant VITALY VOLKOV. An Affidavit of Service was filed as to Defendant VITALY VOLKOV indicating that service occurred on December 19, 2022, at the above address in Fort Lee, New Jersey pursuant to *Civil Practice Law and Rules* § 308(1). According to an Affidavit of Service filed Defendant AIRBNB was served on December 12, 2022, by service upon a "[l]egal [r]epresentative" of CSC (Corporation Services Company).[1] Defendants ZOYA, VITALY and GARY VOLKOV failed to answer. Defendant AIRBNB filed the instant pre-answer Motion to Dismiss.

Plaintiff alleges that she fell on August 22, 2022, on property owned by the VOLKOV Defendants located at 86 Sgt. Andrew Bucher Road, Village of Monticello, Sullivan County. Plaintiff also alleged in the Complaint that Defendant AIRBNB managed, owned and operated the subject location, short term rental, that she rented using their website services. In the Verified Complaint Plaintiff also alleges that Defendant AIRBNB was a "lessor" and the "lessee" of the aforementioned property. See ¶¶ 24 and 28. Plaintiff alleges in the verified Complaint that Defendant AIRBNB operated the short-term rental located at the subject location in Monticello, New York. See ¶ 32. Further, Plaintiff alleged in the Verified Complaint that the VOLKOV

---

[1] CSC is AIRBNB's Registered Agent in New York, according to the Affirmation of Jared Limbach, Esq.

Defendants engaged in the business of short-term rental of the subject property for profit and listed the property for rent on the website owned and operated by Defendant AIRBNB "and through the…website contracted for and accepted monetary payment from defendants to stay at the premises for a period of less than 30 days." ¶ 33. In the Verified Complaint the Plaintiff alleges that Defendant AIRBNB "operated an online marketplace and hospitality service via its website that listed and advertised the [subject property] for short-term, for-profit rental, published certain photographs and 'reviews' calculated to induce visitors to agree to rent the premises for profit, provided assurances of legal protection in the form of a 'Host Guarantee' and 'Host Protection Program' and provided the means by which prospective tenants/invitees/licensees contracted by defendants ZOYA VOLKOV, VITALY ZOLKOV and GARY VOLKOV to rent the premises." ¶ 34. The Plaintiff also alleges that she was induced to engage in the short-term rental by the covenants and warranty regarding the condition and safety of the premises published on Defendant AIRBNB's website. ¶¶ 35- 38. According to the Verified Complaint, on August 22, 2022, Defendant AIRBNB breached that warranty due to the failure to maintain the property in a safe and proper condition which Plaintiff asserts caused her to fall on the stairs at the subject location.

Defendant AIRBNB asserts that the undersigned lacks jurisdiction over them because they are not subject to either general or specific personal jurisdiction under New York State's long-arm statute or the Fourteenth Amendment of the United States Constitution. Further, Defendant AIRBNB argues that the instant Complaint fails to state a cause of action since AIRBNB is an online booking platform that does not own or maintain the premises Plaintiff rented from the co-Defendants where she alleges her injuries were sustained.

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

## _Dismissal Pursuant to Civil Practice Law and Rules § 3211(a)(8)_

**_Arguments_**

    Defendant AIRBNB asserts that they are a corporation formed under Delaware law with their principal place of business in San Francisco, California. They deny any continuous and systemic contacts with New York and assert they are therefore not subject to general personal jurisdiction under _Civil Practice Law and Rules_ § 301. Additionally, Defendant AIRBNB asserts they are not subject to specific personal jurisdiction under _Civil Practice Law and Rules_ § 302(a) because the Plaintiff has not demonstrated and cannot demonstrate any one of the four (4) statutory requirements: (i) that AIRBNB purposefully transacted business in New York and that Plaintiff's claims are substantially related to such business as required by _Civil Practice Law and Rules_ §302(a)(1); (ii) that AIRBNB committed a tortious act in New York as required by _Civil Practice Law and Rules_ § 302(a)(20; (iii) that AIRBNB committed a tortious act outside New York that caused injury in the forum as required by _Civil Practice Law and Rules_ § 302(a)(3); and (iv) that AIRBNB owns, uses or possesses property in New York as required by _Civil Practice Law and Rules_ § 302(a)(4). The second argument raised is that allowing Plaintiff to exercise personal jurisdiction over AIRBNB in New York would violate the due process requirement of the Fourteenth Amendment of the United States Constitution.

    Plaintiff contends that this Court has jurisdiction over Defendant AIRBNB in this action since the Defendant "electronically entered the State of New York by allowing its members to access its website within the State of New York, entering into agreements with its members" specifically Plaintiff and other hosts and also profiting from transactions that are conducted entirely in New York. According to Plaintiff she is a resident of New York who transacted an

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

agreement for a short-term rental on a website owned and operated by Defendant AIRBNB "for premises owned by defendants VOLKOV located within the State of New York."   "The facts alleged in the complaint and affidavits in opposition to such a motion to dismiss are deemed true and construed in the light most favorable to the plaintiff, and all doubts are to be resolved in favor of the plaintiff." *Fanelli v. Latman*, 202 AD3d at 759 *quoting Nick v. Schneider*, 150 AD3d 1250, 1251 (2d Dept 2017).

Plaintiff in opposition to Defendant AIRBNB's motion to dismiss asserts that the motion is premature.  The basis of the argument is that there has not been a reasonable opportunity for disclosure prior to making the motion regarding  whether there were prior accidents "at defendants VOLKOV's subject premises" or the existence of any indemnification agreements between Defendant AIRBNB and the VOLKOV Defendants.   Plaintiff citing *Civil Practice Law and Rules* § 3124 asserts that a summary judgment motion can be stayed when "facts essential to justify opposition to a motion for summary judgment are exclusively within the knowledge and control of the movant."[2]   According to Plaintiff the basis for a stay or denial is that neither Defendant AIRBNB or the VOLKOV Defendants have filed an Answer or "provided plaintiff with a reasonable opportunity to complete discovery prior to filing the subject motion."   Plaintiff argues that she needs "[e]ssential items of discovery" which includes "notices of prior accidents at the subject premises, whether Defendant AIRBNB had notice of the hazardous condition and copies of any agreements between Defendant AIRBNB and the VOLKOV Defendants regarding indemnification for injuries sustained at the subject premises.    Additionally, Plaintiff's argues

---

[2] Defendant AIRBNB's motion is a pre-Answer Motion to Dismiss pursuant to *Civil Practice Law and Rules* § 3211, not a Motion for Summary Judgment pursuant to *Civil Practice Law and Rules* § 3212.

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

that the indemnification agreement is essential because Defendant AIRBNB's indicates that a "Host Liability Insurance Program" exists to indemnify hosts for injuries sustained when guests are at a host's premises and the existence of that program "induc[es] visitors to agree to rent the premises for profit by providing assurances of legal protection" from the Host Protection Program.

*Law/Analysis*

A plaintiff is not required to plead and prove personal jurisdiction in a complaint. *See Picahrdo v. Zayas*, 122 AD3d 699 (2d Dept 2014). However, where jurisdiction is contested, the party seeking to assert personal jurisdiction bears the ultimate burden of providing the basis. *See Marist College v. Brody*, 84 AD3d 1322, 1322-1323; *Aybar v. U.S. Tires and Wheels of Queens, LLC*, 211 AD3d 40, 49 (2d Dept 2022); *Fanelli v. Latman*, 202 AD3d 758 (2d Dept 2022; *Chiesa v. McGregor*, 209 AD3d 963, 967 (2d Dept 2022); *Mejia-Haffner v. Killington, Ltd.*, 119 AD3d 912 (2d Dept 2014). In opposing a motion to dismiss a complaint pursuant to *Civil Practice Law and Rules* § 3211(a)(8) "a plaintiff 'need only make a prima facie showing' that personal jurisdiction over the moving defendant exists." *Fanelli v. Latman*, 202 AD3d at 759 *quoting Opticare Acquisition Corp. v. Castillo*, 25 AD3d 238 (2d Dept 2005); *Whitcraft v. Runyon*, 123 AD3d 811 (2d Dept 2014); *Weitz v. Weitz*, 85 AD3d 1153 (2d Dept 2011). However, when a plaintiff opposes a motion to dismiss pursuant to *Civil Practice Law and Rules* § 3211(a)(8) on the ground that discovery on the issue of personal jurisdiction is necessary, the plaintiff does not need to make a prima facie showing of jurisdiction and instead "need only demonstrate that facts 'may exist' to exercise personal jurisdiction over the defendant." *Ying Jun Chen v. Lei Shi*, 19 AD3d 407, 407-408 (2d Dept 2005). Pursuant to *Civil Practice Law and Rules* § 3211(d) if "it appear[s] from affidavits submitted in opposition to a motion made under subdivision (a) or (b) that facts essential to justify opposition may exist but cannot be stated, the court may deny the motion, allowing the moving party to assert the objection in his responsive pleading...or may order a

6

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

continuance to permit further affidavits to be obtained or disclosure to be had and may make such other order as may be just." *See also Deer Consumer Products, Inc. v. Little*, 35 Misc3d 374 (Sup Ct, NY Cty, 2012).

Here, the Plaintiff has failed to demonstrate that facts may exist on the issue of personal jurisdiction to warrant holding Defendant AIRBNB's motion in abeyance while discovery is conducted. *See Civil Practice Law and Rules* § 3211(d). Plaintiff's speculative argument that there may be an agreement between AIRBNB and the VOLKOV Defendants under the Host Protection Program is meritless. Plaintiff has attached a copy of a summary of the "Host liability insurance" as support for the existence of a fact for which more discovery is necessary. However, the summary provided by Plaintiff demonstrates that the "Host liability insurance" is not an agreement with Defendant AIRBNB to indemnify members who are hosts but rather a program in which insurance is offered through "Zurich Insurance, plc." The summary provided by Plaintiff fails to indicate that an agreement may exist between Defendant AIRBNB and the VOLKOV Defendants indemnifying the VOLKOV's for accidents at the subject rental location.

Under *Civil Practice Law and Rules* § 302(a)(1) a "court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent…transacts any business within the state or contracts anywhere to supply goods or services in the state." *See also Kreutter v. McFadden Oil Corp.*, 71 NY2d 460, 467 (1988). In order to determine whether personal jurisdiction exists under *Civil Practice Law and Rules* § 302(a)(1) a court must determine (1) whether the defendant transacted business in New York and if so (2) whether the cause of action asserted rose from that transaction. *See Licci v. Lebanese Can. Bank, SAL*, 20 NY3d 327, 334 (). "[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 NY2d at 467. The Court has defined purposeful activities as "those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities

7

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 NY3d 375, 380 (2007). "[D]etermining what facts constitute 'purposeful availment' is an objective inquiry, it always requires a court to closely examine the defendant's contacts for their quality." *Paterno v. Laser Spine Inst.*, 112 AD3d 34, 40 (2d Dept 2013) *quoting Licci v. Lebanese Can. Bank, Sal*, 20 NY3d at 328. Further, "[w]hether a non-domiciliary has engaged in sufficient purposeful activity to confer jurisdiction in New York requires an examination of the totality of the circumstances." *Id*. As to the second prong of the jurisdictional inquiry the Court of Appeals has indicated that in light of all of the circumstances of the matter there must be an "articulable nexus" (*McGowan v. Smith*, 52 NY2d 268, 272 (1981) or a "substantial relationship" (*Kreutter v. McFadden Oil Corp.*, 71 NY2d at 467) between a defendant's activity in the state and the claim asserted. *See Licci v. Lebanese Can. Bank, SAL*, 20 NY3d at 339.

The Plaintiff failed to make a prima facie showing that personal jurisdiction over Defendant AIRBNB existed under *Civil Practice Law and Rules* § 302(a)(1), general jurisdiction. As to the general all-purpose jurisdiction, the Complaint does not make a prima facie showing of personal jurisdiction over Defendant AIRBNB. The relationship between the causes of action asserted in the complaint against Defendant AIRBNB and their activity through the website within New York are insubstantial and do not warrant a New York court's exercise of personal jurisdiction over Defendant AIRBNB pursuant to *Civil Practice Law and Rules* § 302(a)(1). Plaintiff has established in her Complaint that there was an agreement between herself and the VOLKOV Defendants for a short-term rental of the subject location, but she has not established that agreement included Defendant AIRBNB or that they were a party to the agreement in any manner. Further, none of the facts alleged in the Complaint support a conclusion that AIRBNB's contacts with New York are "continuous and systematic" such to render the company "essentially at home" in New York. *See Daimler AG v. Bauman*, 571 US 117, 137 (2014).

The Complaint is silent, and the allegations are bare as to Defendant AIRBNB's business in general (i.e. how the Plaintiff engaged with Defendant AIRBNB on the website) and its conduct

8

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

in the State of New York as it pertains to the agreement entered into by Plaintiff for the short-term rental of the subject location. There are no allegations within the Complaint that demonstrate Defendant AIRBNBD conducted sufficient purposeful activities in New York which bore a substantial relationship to the subject matter of the action such that they availed themselves of the benefits and protections of New York laws. *See Unitrade Corp. v. International Data Sys., Inc.*, 114 AD3d 934, 935 (2d Dept 2014); *See also Iavarone v. Northpark Partners, LP*, 89 AD3d 902, 903 (2d Dept 2011). Plaintiff's assertions in the Complaint that Defendant AIRBND owned, managed, or was involved in the rental of the subject location are belied by Plaintiff's own statements within the instant motion referencing the property being owned by the VOLKOV Defendants, not Defendant AIRBNB. Additionally, Plaintiffs allegations of Defendant AIRBNB's involvement in the ownership, management and rental of the subject location are directly contradicted by the Terms of Service provided by Defendant AIRBNB.[3] In opposition to Defendant AIRBNB's motion, Plaintiff did not assert that jurisdiction over the Defendant was proper pursuant to *Civil Practice Law and Rules* § 301 and instead made a general argument that Defendant AIRBNB's motion was insufficient. As such, Plaintiff has failed to meet their burden of providing a basis for personal jurisdiction against Defendant AIRBNB in the instant action.

*Civil Practice Law and Rules* § 302(a)(1), (2), (3) or (4) provide specific actions by a defendant that allow a court exercise personal jurisdiction over a non-domiciliary. Plaintiff has not argued upon which section of § 302 specific jurisdiction should be exercised over the non-domiciliary Defendant AIRBNB. Therefore, the Court will analyze the facts asserted as to each applicable section of *Civil Practice Law and Rules* § 302.

Pursuant to *Civil Practice Law and Rules* § 302(a)(1) "a court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent…transacts any business

---

[3] Plaintiff challenges Defendant AIRBNB's reliance on the unsigned, undated, and uncertified Terms of Service based upon their inadmissibility. However, Plaintiff in opposition submitted an unsigned, undated, and uncertified copy of the summary of the Host Liability Program and seeks this Court to rely upon that document in opposition to the Defendants' motion. Both documents appear to have been obtained from the AIRBNB website/platform. The Court accepted and considered both documents despite the issues regarding admissibility.

9

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

within the state or contracts anywhere to supply goods or services in the state." *See Cornely v. Dynamic HVAC Supply, LLC*, 44 AD3d 986 (2d Dept 2007); *George Reiner & Co. v. Schwartz*, 41 NY2d 648, 650-653 (1977). There are two (2) requirements to establish personal jurisdiction under § 302(a)(1); (1) the defendant must have transacted business within the state, and (2) the claim asserted must arise from that business activity. *See McGowan v. Smith*, 52 NY2d at 273. "Whether a non-domiciliary is transacting business…is a fact based determination, and requires a finding that the non-domiciliary activities were purposeful and established 'a substantial relationship between the transaction and the claim asserted." *Paterno v. Laser Spine Institute*, 24 NY3d at 376 *quoting Fischbarg v. Doucet*, 9 NY3d at 380. In *Fischbarg*, the Court defined "purposeful activities" as "volitional acts by which the non-domiciliary avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 NY3d at 380 *quoting McKee Elec. Co. v. Rauland-Borg Corp.*, 20 NY2d 377, 382 (1967). It is necessary to have more than limited contacts for purposeful activities to establish a non-domiciliary has transacted business in New York. *See Paterno v. Laser Spine Institute*, 24 NY3d at 376. The manner in which a non-domiciliary with no in state physical presence transacts business is New York is not dispositive of the question of jurisdiction. Long-arm jurisdiction has been found over businesses using electronic and telephonic means of reaching into New York to conduct business. *See Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 NY3d 65 (2006).

"The 'advent of the internet' has created 'a new set of challenges' regarding personal jurisdiction." *Gilbert v. Indeed, Inc.*, 513 FSupp3d 374, 413 (S.D.N.Y. 2021) *quoting Citigroup Inc. v. City Holding Co.*, 97 FSupp2d 549, 565 (S.D.N.Y. 200). Personal jurisdiction in the internet context in New York courts depends on sliding scale based upon the degree to which users can interact with a particular website and which classify websites as (1) "interactive, (2) "middle ground," and (3) "passive." *See Royalty Network Inc. v. Dishant.com, LLC*, 638 FSupp2d 410 (S.D.N.Y. 2009); *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 FSupp 1119 (W.D.PA. 1997).

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

Since websites are generally accessible everywhere the fact that a website is available to users in New York alone does not reach the level of transacting business for the purposes of § 302(a)(1). *See Capitol Records, LLC v. VideoEgg, Inc.*, 611 FSupp2d 349 (S.D.N.Y. 2009). Passive websites have been defined as those that merely make information available to viewers and are similar to an advertisement in a nationally available magazine or newspaper. *See Citigroup Inc. v. City Holding Co., supra.* The Second Department, Appellate Division has found "passive" websites to be those that merely provide information without permitting a business transaction and are generally insufficient to establish personal jurisdiction. *See Grimaldi v. Guinn*, 72 AD3d 37 (2d Dept 2010). In contrast to a passive website, an interactive website is one that knowingly transmits goods and services to users in other states through purposeful activity directed into the forum state. *See Mattel , Inc. v. Adventure Apparel*, 2001 WL286728 *1 (S.D.N.Y. 2001). The area in the middle are those websites in which a defendant maintains an interactive web site which allows exchange of information between users in another state and the defendant and jurisdiction depends on the level and nature if the exchange. *See Citigrouo, Inc. v. City Holding Co.*, 97 FSupp2d at 565.

In support of their motion to dismiss Defendant AIRBNB asserts that they are a "passive" website because even though it provided information about AIRBNB's services and allowed the Plaintiff and Defendant to communicate it did not contemplate sales directly with the Defendant. In essence, Defendant AIRBNB argues they are a conduit service that links parties looking for services, similar to a "for rent" advertisement in a newspaper, which is insufficient to confer jurisdiction. Plaintiff does not assert any argument as to the interactivity level of Defendant AIRBNB's website and instead a basis of her argument for jurisdiction based upon her ability to access the website and communicate with the Defendants for the purpose of the short-term rental. Courts have found that passive websites combined with other business activity may provide a reasonable basis for the assertion of personal jurisdiction. *See Grimaldi v. Guinn*, 72 AD3d at 49 *citing CompuServe, Inc. v. Patterson*, 89 F3d 1257 (6th Cir. 1996) (personal jurisdiction found

11

where plaintiff entered into a contract with the company in the forum state, the contract had a forum selection clause and there were multiple e-mails exchanged); *Citigroup, Inc. v. City Holding, Co., supra* (personal jurisdiction found where customers in New York could apply for loans on-line and print out the application for the purpose of faxing it, there was a hyper link that allowed the user to chat with a lending representative, email exchanges were allowed between the plaintiff and defendant). However, in contrast recently a defendant who was domiciled in Texas who sent a LinkedIn invitation to a plaintiff in New York which invited her to connect to the defendant's social media site did not qualify as purposeful availmemt of the privilege of conducting activity in New York and did not serve as a basis for long-arm jurisdiction under *Civil Practice Law and Rules* § 302(a)(1). *See Gilbert v. Indeed, Inc.*, 513 FSupp3d 374 (S.D.N.Y. 2021) (court noted LinkedIn allows passive display of employment history of users but it can also be used interactively by allowing users to seek jobs, post news articles or comment on other members announcements).

The Court finds that Defendant AIRBNB's website does not rise to the level of an "interactive" website. Rather, AIRBNB's website has "passive" display features and some interactive use by its members since its website allows hosts and prospective renters to both create accounts, communicate with each other, exchange information and AIRBNB collects a fee from hosts to advertise the premises or experiences they are renting. AIRBNB's website is similar to Indeed's employment advertising site since it allows passive display of properties for rent but also can be used interactively by members so they can make arrangements for rental. In making the determination as to where on the "sliding scale" of interactivity Defendant AIRBNB's website falls the Court considered the business model of Defendant AIRBNB described in the Affidavit of Katharine Brockman, a Legal Investigations Associate at AIRBNB, Inc. In the Brockman Affidavit she asserts that AIRBNB's role is limited to providing a platform where members can publish their offers, members can search offerings and requires all users (hosts and guests) to register with AIRBNB and each member signs a "terms of Service" by clicking an electronic

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

button if they are in agreement with the terms. According to AIRBNB no other agreements are entered into, the hosts are responsible for their listings and all the content that is part of the listing, none of the hosts operates as an employee or agent of AIRBNB and all agreements for services between hosts and guests are entered into directly between and AIRBNB is not party to those agreements. There is nothing within the record before this Court that demonstrates that the interactive portions of Defendant AIRBNB's website resulted in AIRBNB purposefully transacting business via their website with people in New York. The interactive portions of the AIRBNB website in relation to the facts of the instant action do not rise to the level of interactions with New York State that would establish personal jurisdiction.

Allowing the Plaintiff to interpret the meaning of "transacting business" to include conduct Defendant AIRBNB's provision of a platform for rental advertisement would cause an expansion of AIRBNB's personal jurisdiction to any state for merely operating their website without a showing or evidence of commercial activity in that state. *See Freeplay Music, Inc. v. Cox Radio, Inc.*, 2005 WL 1500896 at *7 (S.D.N.Y. June 23, 2005). The AIRBNB platform is similar to a national newspaper that includes advertisements for rent and other services within the paper by taking a fee from the lister for their advertisement to obtain the national exposure. The distinction is that Defendant AIRBNB has taken the national paper to a new level, worldwide exposure by creating listings on the internet. Just as the national newspaper would not be found to have been transacting business by printing a "for rent" advertisement in the paper, neither can Defendant AIRBNB's actions rise to the level of transacting business solely because they have changed the advertisement platform. Defendant AIRBNB is not the owner, possessor and has no leasehold interest in the accommodations that are listed on their website, just like a newspaper which includes listings for rent. *See Gannon v. Airbnb, Inc.*, 295 So.3d 779, 782-783 (Fla Dist Ct App 2020) (In this case the Court noted that AIRBNB, Homeaway.com, Inc., and TripAdvisor, LLC like other travel companies does not own, possess or have a leasehold interest to convey any of the properties listed on their online platforms). Based upon the facts, the conduct of AIRBNB is not sufficient

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

to rise to the level of transacting business that would allow the Plaintiff to assert jurisdiction over them pursuant to *Civil Practice Law and Rules* § 302(a)(1).

As to *Civil Practice Law and Rules* § 302(a)(2) "a court may exercise personal jurisdiction over any non-domiciliary....who in person or through an agent...commits a tortious act within the state." "To be considered an 'agent' for purposes of *Civil Practice Law and Rules* § 302(a) there must be a demonstration that an individual has "engaged in purposeful activities in the State in relation to a transaction for the benefit of and with the knowledge and consent of the defendant and the defendant must have exercised some control over the agent in the matter." *America/Intl. 1994Venture v. Mau*, 146 AD3d 40, 54 (S.D.N.Y. 2016) (emphasis added). An important factor in making the determination as to the control exercised over the agent is the degree of control exercised by the non-domiciliary defendant over the agent. *See Barbarotto Intl. Sales Corp. v. Tullar*, 188 AD2d 503, 504 (2d Dept 1992) *citing Lupton Assocs. v. Northeast Plastics*, 105 AD2d 3, 7 (4th Dept 1984). Nothing within the Complaint or asserted by Plaintiff demonstrates Defendant AIRBNBD committed a tortious act within New York or that the VOLKOV Defendants were an agent for Defendant AIRBNB. Similarly, accepting all of the Plaintiff's allegations in the Complaint that Defendant committed a tortious act within New York State which caused injury to the Plaintiff as true, the Plaintiff's Complaint failed to present any evidence that Defendant regularly did or solicited business or engaged in any persistent course of conduct or derived substantial revenue from goods used or consumed or services rendered in New York or derived substantial revenue from interstate or international commerce. *See Civil Practice Law and Rules* § 302(a)(3)(i) and (ii); *See also Shatara v. Ephraim*, 137 AD3d 1248, 1249 (2d Dept 2016).

*Civil Practice Law and Rules* § 302(a)(4) provides a basis for long-arm jurisdiction for a cause of action in which it is asserted defendant owns, uses, or possesses real property in New York. In general this section allows for jurisdiction for personal injury claims for injuries suffered on the property among other bases related to property ownership and possession. Plaintiff asserts in the instant matter in her Complaint that Defendant AIRBNB is the owner, manager, lessee and

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

lessor of the subject property. However, in opposition to Defendant AIRBNB's motion Plaintiff solely asserts that the subject property is owned by the VOLKOV Defendants. This assertion belies the allegations within the Complaint and also negates any argument (although none was made by Plaintiff in opposition to the instant motion) that long-arm jurisdiction exists as to Defendant AIRBNB under *Civil Practice Law and Rules* § 302(a)(4). Based upon the foregoing the Plaintiff has failed to meet their prima facie burden in demonstrating the existence of personal jurisdiction as to Defendant AIRBNB pursuant to *Civil Practice Law and Rules* § 302(a)(4).

Turning to the balance of the sections pursuant to *Civil Practice Law and Rules* § 302 for which personal jurisdiction may be established as to a non-domiciliary. The facts in the instant matter do not fall within *Civil Practice Law and Rules* § 302(3)(i), (ii) since the allegation is that the tortious act occurred within the state and the injury to the Plaintiff occurred within the state. As such analysis of those sections is unnecessary as they are inapplicable.

Here, the Plaintiff has failed to make a prima facie showing that Defendant AIRBNB engaged in any of the actions set forth in *Civil Practice Law and Rules* § 302(a)(1), (2), (3) or (4). As such, specific jurisdiction has not been obtained over Defendant AIRBNB and Defendant AIRBNB's motion pursuant to *Civil Practice Law and Rules* § 3211(a)(8) is granted.

Defendant AIRBNB's arguments and Plaintiff's opposition as to *Civil Practice Law and Rules* § 3211(a)(7) are not addressed as they are moot based upon the Court's determination as to personal jurisdiction.

In arriving at this decision the Court has reviewed, evaluated, and considered all of the issues framed by these motion papers and the failure of the Court to specifically mention any particular issue in this Decision and Order does not mean that it has not been considered by the Court in light of the appropriate legal authority.

Accordingly, it is hereby

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

**ORDERED** that Defendant's Motion to Dismiss pursuant to *Civil Practice Law and Rules*

§ 3211(a)(8) is granted and the matter is dismissed as to Defendant AIRBNB, Inc. due to a lack of

personal jurisdiction.

The foregoing constitutes the Decision and Order of this Court on Motion #1.


Dated:  Goshen, New York
June 15, 2023

_____

Hon. Elena Goldberg-Velazquez, J.S.C.

To:

H. BRUCE FISCHER, ESQ.
Attorney for Plaintiff
(via NYSCEF)

DONNELLY MINTER & KELLY, INC.
Attorneys for Defendant AIRBNB, INC.
(via NYSCEF)

GARY VOLKOV
Defendant
333 Westview Avenue
Fort Lee, NJ 07024

ZOYA VOLKOV
Defendant
333 Westview Avenue
Fort Lee, NJ 07024

VITALY VOLKOV
Defendant
333 Westview Avenue
Fort Lee, NJ 07024

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

# EXHIBIT 2

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

ⓘ Cited
As of: February 9, 2023 7:40 PM Z

## *Conrad v. Benson*

United States District Court for the District of South Carolina, Beaufort Division

August 13, 2020, Decided; August 14, 2020, Filed

C/A. No. 9:20-cv-1811-RMG

**Reporter**
2020 U.S. Dist. LEXIS 149427 *; 2020 WL 4754332

Clara Bullard Conrad, Plaintiff, v. Frank P. Benson MD; Melody A. Griffin; Atlantic Capital Bancshares, Inc. d/b/a/ Atlantic Capital Bank, N.A.; Mortgage Electronic Registration Systems, Inc.; and Expedia Group d/b/a/ Vrbo, Defendants.

## Core Terms

website, Travelers, personal jurisdiction, interactive, properties, targeting, rental, property owner, online, hotel, contacts, forum state, reservation, general jurisdiction, purposefully, transactions, third-party, customers, Internet, affirms

**Counsel:** [*1] For Clara Bullard Conrad, Plaintiff: Joseph Alfred Vasquez, LEAD ATTORNEY, Setzler and Scott, W Columbia, SC; Jim Wegmann, Weidner and Wegmann, Six Professional Village Creek, Beaufort, SC.

For DMD Frank P Benson, Melody A Griffin, Atlantic Capital Bancshares Inc, doing business as Atlantic Captial Bank NA, Defendants: Matthew E Tillman, LEAD ATTORNEY, Womble Bond Dickinson US LLP, Charleston, SC.

**Judges:** Richard Mark Gergel, United States District Judge.

**Opinion by:** Richard Mark Gergel

## Opinion

### ORDER AND OPINION

This matter is before the Court on Defendant Expedia Group d/b/a Vrbo's (hereinafter "HomeAway")[1] motion to dismiss (Dkt. No. 13). For the reasons set forth below, the Court grants the motion.

### I. Background

On November 9, 2017 Plaintiff Clara Bullard Conrad's son-in-law, non-party John Foley, allegedly "entered into a rental contract with Defendant [HomeAway] for the" real property located at 85 Sunset Boulevard, Beaufort, South Carolina (the "Subject Property"). (Dkt. No. 1-1 ¶ 7).[2] Defendants Frank P. Benson and Melody A. Griffin allegedly owned the Subject Property. (*Id.* ¶¶ 2-3). On April 29, 2018, as Plaintiff was walking across a walkway at the Subject Property, she

---

[1] Defendant Expedia Group d/b/a Vrbo contends that Plaintiff incorrectly named "Expedia Group d/b/a/ Vrbo" as a defendant in this lawsuit instead of "HomeAway.com, Inc." (Dkt. No. 13-1 at 4). Plaintiff admits that "Expedia Group d/b/a/ Vrbo" was named in error but "asserts the correct name of the defendant should be 'Expedia, Inc., d/b/a HomeAway, Inc. a/k/a Vrbo.'" (Dkt. No. 14 at 1 n.1). For simplicity's sake, the Court refers to named Defendant Expedia Group d/b/a/ Vrbo as "HomeAway."

[2] To support the contention HomeAway rented Foley the Subject Property, the complaint cites to an exhibit attached therein. Said exhibit is not a rental contract, however, but a copy of an email exchange between Foley and Defendant Frank Benson concerning the Subject Property's availability. *See* Exhibit A, (Dkt. No. 1 at 15-16). In her opposition to HomeAway's motion to dismiss, Plaintiff admits that HomeAway did not rent Foley the Subject Property. (Dkt. No. 14 at 2) ("On November 9, 2017, the Plaintiff's son-in-law, John Foley, entered into a rental contract through HomeAway with Defendant Benson and Defendant Griffin for the" Subject Property.)

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

"tripped on a rotted, loose plank and fell." [*2] (*Id.* ¶ 15). Plaintiff was injured, (*Id.* ¶ 17), and initiated this lawsuit on April 13, 2020.[3] Plaintiff brings causes of action for: (1) premises liability as against Benson and Griffin; (2) negligence as against Benson and Griffin; (3) premises liability as against HomeAway; (4) negligence as against HomeAway; and (5) negligent supervision as against all Defendants.

On July 7, 2020 HomeAway filed a motion to dismiss for lack of personal jurisdiction. (Dkt. Nos. 13, [15]), which Plaintiff opposes, (Dkt. No. 14). HomeAway submitted affidavits from three employees in support of its motion. Charlotte Davis, Senior Manager for North American Traveler Marketing at HomeAway, affirms that: "HomeAway operates an online marketplace via certain websites, including Vrbo.com, that allow third-party property owners and managers domestically and internationally to list their properties for short-term rent and connect with individuals who are seeking to rent a house or apartment, referred to as 'Travelers.'" (Dkt. No. 13-2 at 3). Davis affirms said "websites are not directed at Travelers (including Plaintiff) from any particular state, including South Carolina" and that "HomeAway makes its websites [*3] available domestically and internationally — generally, to anyone who seeks out those websites on the internet, regardless of where they live." (*Id.*). Lee Huberman, Product Manager for HomeAway, affirms that "HomeAway does not own or operate any properties and is not a party to a rental transaction between the third-party property owners and/or managers and the Travelers." (Dkt. No. 13-3 at 3). Brittany Miers, Business Paralegal for the Americas at HomeAway, affirms that "HomeAway ***does not*** own, operate, manage or control any properties and is not a party to rental transactions between the third-party property owners and/or

managers and the Travelers — including the" Subject Property. (Dkt. No. 13-4 at 4). Miers explains: "HomeAway acts as an online marketplace that enables third-party property owners and/or managers to list their properties and potential Travelers to search for and book those properties and engage in rental transactions directly with those property owners and/or managers. Property owners and managers are solely responsible for all listing content and upload their own property descriptions and photographs to the online marketplace." (*Id.*). Miers continues that "[o]nce [*4] a reservation is made, the Member and Traveler may communicate" with each other via a messaging space on the HomeAway website called "the reservation dashboard." *See* (Dkt. No. 18-1 at 5). Miers also affirms that HomeAway is a Delaware corporation headquartered in Texas which does not employee individuals nor maintain bank or investment accounts in South Carolina. (Dkt. No. 13-4 at 4-5).

## II. Legal Standard

When personal jurisdiction is challenged, the burden is on the plaintiff to establish jurisdiction. *Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)*. When resolved on written submissions, the plaintiff must make a "*prima facie* showing of a sufficient jurisdictional basis." *Id.* The plaintiff's showing must be based on facts set forth in the record, taken in the light most favorable to the plaintiff. *Magic Toyota, Inc. v. Se. Toyota Distribs., Inc., 784 F. Supp. 306, 310 (D.S.C. 1992)*; *Sonoco Prods. Co. v. ACE INA Ins., 877 F. Supp. 2d 398, 404-05 (D.S.C. 2012)* (internal quotation and alteration marks omitted). However, a court "need not credit conclusory allegations or draw farfetched inferences." *Sonoco, 877 F. Supp. 2d at 405* (citations omitted).

To meet their burden, a plaintiff must show (1) that South Carolina's long-arm statute authorizes jurisdiction, and (2) that the exercise of personal jurisdiction complies with constitutional due

---

[3] On May 8, 2020, Benson and Griffin removed this action to federal court. (Dkt. No. 1). Because Plaintiff had not yet served the remaining defendants at this time, their consent was not necessary for Benson and Griffin to effectuate removal. (*Id.* at 5).

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

process requirements. *See, e.g. Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001)*. Since South Carolina's long-arm statute extends [*5] to the constitutional limits of due process, the only inquiry is whether due process requirements are met. *ESAB Group, Inc. v. Centricut, LLC, 34 F. Supp. 2d 323, 328 (D.S.C. 1999)*; *S. Plastics Co. v. S. Commerce Bank, 310 S.C. 256, 423 S.E.2d 128 (S.C. 1992)*.

Due process requires that a defendant have sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* (citations omitted). This can be met by showing either general or specific personal jurisdiction. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711-12 (4th Cir. 2002)* (citations omitted). To assert general jurisdiction, a defendant's contacts must be "so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman, 571 U.S. 117, 127, 134 S. Ct. 746, 754, 187 L. Ed. 2d 624 (2014)* (citations omitted). For a corporation, that traditionally renders them subject to general jurisdiction in its state of incorporation or principal place of business. *Id. at 137*.

To determine whether specific jurisdiction exists, the Court considers "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 397 (4th Cir. 2003)* (citations omitted). In other words, a defendant must have "minimum [*6] contacts" with the forum, the claim must arise from those contacts, and personal jurisdiction must be reasonable. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 - 476, 105 S. Ct.*

*2174, 85 L. Ed. 2d 528 (1985)*. Courts evaluate the reasonableness by considering "(a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering substantive social policies." *Lesnick v. Hollingsworth & Vose Co., 35 F.3d 939, 946 (4th Cir. 1994)*. "Minimum contacts" and "reasonableness" are not independent requirements; rather, they are both aspects of due process, and thus "considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King, 471 U.S. at 477*.

## III. Discussion

The Court does not have general jurisdiction over HomeAway. HomeAway is not incorporated in South Carolina, nor does it have its principal place of business in South Carolina. Plaintiff has not presented any other facts to indicate that HomeAway is "essentially at home" in South Carolina. Therefore, general jurisdiction does not exist over HomeAway.

As to specific jurisdiction, the Court finds the Fourth Circuit's recent decision *Fidrych v. Marriott International, Inc., 952 F.3d 124 (4th Cir. 2020)* instructive. In [*7] *Fidrych*, a South Carolina resident sued the hotel chain Marriott for injuries suffered during a visit at a franchise hotel in Italy. *Id. at 129*. Marriott was a foreign corporation registered to do business in South Carolina. *Id. at 128*. Marriott's website permitted online booking and was accessible in South Carolina. *Id. at 129*. When reserving a room online, the website required guests to provide their address and allowed guests to use a drop-down menu to select their place of residence. *Id*. This drop-down menu included South Carolina, as well as every other state in the country and every other country in world. *Id*. Of the 6,200 hotels in the Marriott system, ninety were in South

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

Carolina and none of those ninety were owned by Marriott, with sixty-three being franchisees and the remaining twenty-seven being licensed or managed by Marriott. *Id. at 134*.

After declining to find that Marriott was subject to general jurisdiction in South Carolina, *Id. at 134*, the Fourth Circuit addressed whether Marriott was subject to specific jurisdiction. The Court noted that while "Marriott's business activity in South Carolina is not insignificant, as it franchises, licenses, or manages ninety hotels in the state[,] those activities . . . have nothing [*8] to do with the claims asserted by the Plaintiffs in this action." *Id. at 139*. The court then analyzed "the only other action by Marriott . . . arguably relevant" to the jurisdictional inquiry: "[the] operation of its website." The Fourth Circuit observed:

> While Marriott obviously uses its website to engage in commercial transactions, the website does not target South Carolina residents for commercial transactions any more than it targets any other state. Instead of targeting any particular state, the website makes itself available to any one who seeks it out, regardless of where they live. In our view, the mere fact that the website is accessible in a given state does not mean that Marriott is targeting its activities at that state.

*Id. at 139-41* (citing *ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 625 (4th Cir. 1997)* (rejecting claim of specific jurisdiction where defendant did not direct its activities at South Carolina but instead "focused its activities more generally on customers located throughout the United States and Canada without focusing on and targeting South Carolina")).

The court then considered, and rejected, the plaintiffs' argument that specific jurisdiction over Marriott existed on the basis that Marriott's website was "interactive." *See id. at 141* ("Plaintiffs [*9] point out, however, the website is interactive, not passive."); *Id. at 142* (noting "Plaintiffs focus much of their attention on the fact that the website

includes South Carolina as an option in the drop-down menu used by customers to select their state of residence when making reservations"). The court acknowledged that the "interactivity of a website is a jurisdictionally relevant fact." *Id.* (citing *ALS Scan, Inc., 293 F.3d at 713-14*). In *ALS Scan, Inc.* the Fourth Circuit formulated principles for "determining when it can be deemed that an out-of-state citizen, through electronic contacts, has conceptually 'entered' the State via the Internet for jurisdictional purposes." *Id.* (quoting *ALS Scan, Inc., 293 F.3d at 713*). In *ALS Scan, Inc.*, the court held that "[a] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan, Inc., 293 F.3d at 714*.[4]

Applying *ALS Scan, Inc.*, the *Fidrych* court rejected plaintiffs' arguments that the "level of interactivity [*10] of a website like Marriott's is . . . enough, on its own, to make the website a sufficient basis to support the exercise of specific jurisdiction." *Id. 142* (noting Marriott's website fell into *Zippo*'s "middle ground"). The court reasoned:

> The interactivity of the website is relatively limited—it permits customers to input their

---

[4] *ALS Scan, Inc. v. Digital Service Consultants, Inc., 293 F.3d 707, 714 (4th Cir.2002)* expressly adopted and adapted the model for Internet-based specific jurisdiction developed in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997)*. *Zippo* articulated a "sliding-scale" approach to personal jurisdiction in cases arising from electronic commerce. *Zippo* held that when a defendant runs an interactive site, through which he "enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet," he can properly be haled into the courts of that foreign jurisdiction. *Zippo, 952 F. Supp. at 1124*. By contrast, if the defendant's site is passive, merely making information available, the site cannot render him subject to specific personal jurisdiction in a foreign court. *Id.* In the middle ground are semi-interactive websites for which "the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs." *Id. 1124*.

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

travel dates to view available hotels and to book rooms online, which requires them to provide personal and financial information. The website is not used to create a continuing, back-and-forth relationship between Marriott and the website user; it is used to facilitate the making of a one-off hotel reservation. The website is thus in many ways the digital equivalent of a toll-free telephone number, providing a simple, cost-free way for customers to contact the company.

*Id. at 142-43* (warning that if the court were to find personal jurisdiction proper, "every hotel operator would be subject to personal jurisdiction in the state of residence of every guest who used the hotel's website to make the reservation").

Applying *Fidrych* and *ALS Scan, Inc.* to the instant matter, the Court finds it lacks specific jurisdiction over HomeAway. HomeAway has shown, and Plaintiff does not substantively [*11] dispute, that HomeAway neither targets South Carolina in particular nor leases properties directly to South Carolina residents, acting instead "as an online marketplace that enables third-party property owners and/or managers to list their properties and potential Travelers to search for and book those properties and engage in rental transactions directly with those property owners." Miers Affidavit, (Dkt. No. 13-4 ¶ 7); *see* Plaintiff's Opposition, (Dkt. No. 14 at 11) ("While it is true that HomeAway does not specifically target Travelers from in any particular state, including South Carolina, it provides a continuing platform for the Member and the Traveler to communicate regarding the rental and the terms of the lease"); (*Id.* at 2) ("Plaintiff's son-in-law, John Foley, entered into a rental contract . . . with Defendant Benson and Defendant Griffin for [the Subject Property]."). HomeAway's website is indistinguishable—jurisdictionally speaking—from Marriott's in *Fidrych*. Like Marriott's website, HomeAway's website is "accessible to all but targeted at no one in particular," allowing users "to input their travel dates to view available [properties]," "to book

[rentals] online," and "require[ing] [*12] [users] to provide personal and financial information" for payment. *See Fidrych, 952 F.3d at 142* (finding this "level of interactivity . . . not enough, on its own, to make the website a sufficient basis to support the exercise of specific jurisdiction"). The fact HomeAway might be a "continuing platform" whereby third parties, such as Foley and Benson, discuss rentals is, despite Plaintiff's contentions to the contrary, *see, e.g.* (Dkt. No. 14 at 23), irrelevant to the question of whether *HomeAway* purposefully directed electronic activity toward South Carolina with the intent of engaging in business, *ALS Scan, Inc., 293 F.3d at 714*. See *Underwriters at Lloyd's, London v. Dollar Rent-A-Car, Inc., 2008 U.S. Dist. LEXIS 68177, at *30 (D.S.C. 2008)* (holding that the unilateral activity of a third party who claims some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state and noting that "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State"). *Cf. United Cutlery Corp. v. NFZ, Inc., No. CIV CCB-03-1723, 2003 U.S. Dist. LEXIS 21664, 2003 WL 22851946, at *4 (D. Md. Dec. 1, 2003)* (concluding that sales through Internet auction sites such as "eBay" and "Yahoo!" did not demonstrate purposeful availment because "[a]lthough [such] websites were interactive and designed for the purpose of selling products to participating [*13] users, [the defendant seller] exercised . . . [no] control over the audience they targeted"). In sum, "when [HomeAway] set up its generally accessible, semi-interactive Internet website, it did not thereby direct electronic activity into [South Carolina] with the manifest intent of engaging in business or other interactions within that state in particular." *Carefirst of Maryland, Inc., 334 F.3d at 401*. Accordingly, the Court lacks specific personal jurisdiction over HomeAway. *See id.*; *UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 352-53 (4th Cir. 2020)* ("Regardless of where on the sliding scale a defendant's web-based activity may fall, however, '[w]ith respect to specific

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

jurisdiction, the touchstone remains that an out-of-state person have engaged in some activity *purposefully directed* toward the forum state . . . creating a substantial connection with the forum state.'") (citing *ESAB Group, Inc., 126 F.3d at 625*); *see also Shamsuddin v. Vitamin Research Prods., 346 F. Supp. 2d 804, 814 (D. Md. 2004)* (finding no personal jurisdiction over generally accessible interactive website that accepted credit card payments from Maryland customers and sold infringing products into Maryland noting that "although [defendant's] decision to sell its products over the Internet was a 'purposeful' one, that decision alone cannot demonstrate that [defendant] took actions purposefully directed toward Maryland specifically"). [*14]

## IV. Conclusion

For the reasons above, the Court **GRANTS** Defendant Expedia Group d/b/a Vrbo's motion to dismiss (Dkt. No. 13).

**AND IT IS SO ORDERED**.

/s/ Richard Mark Gergel

United States District Court Judge

August 13, 2020

Charleston, South Carolina

---

**End of Document**

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

# EXHIBIT 3

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

No *Shepard's* Signal™
As of: February 9, 2023 7:41 PM Z

## *Schwartz v. Poblete*

Superior Court of California, County of Los Angeles

February 22, 2021, Decided; February 22, 2021, Filed

20STCV22663

**Reporter**

2021 Cal. Super. LEXIS 5573 *

KAREN SCHWARTZ vs TESS POBLETE, et al.

**Notice:** THIS DOCUMENT INCLUDES THE ORDER OF THE COURT. OTHER MATERIALS, SUCH AS LEGAL MEMORANDA, MAY HAVE BEEN INCLUDED BY THE COURT. ACCORDING TO LEXISNEXIS EDITORIAL POLICY, DOCUMENTS THAT ARE COMBINED AND FILED AS ONE DOCUMENT BY THE COURT ARE INCLUDED AS ONE DOCUMENT ON LEXIS ADVANCE.

## Core Terms

Specially-Appearing, websites, argues, travelers, residents, purposefully, discovery, contacts, general jurisdiction, personal jurisdiction, target, asserts, forum state, properties, homeowners, availed, summons, lack of personal jurisdiction, responses, rental, advertise, allegations, nonresident, interacts, benefits, Reply, rent, site, principal place of business, motion to quash service

**Counsel:** [*1] For Plaintiff(s): Robert M. Cohen.

For Defendant(s): Fredrick C. Bingham for Kimberly Arouh via LACourtConnect (Video).

**Judges:** Honorable Michael P. Linfield, Judge.

**Opinion by:** Michael P. Linfield

## Opinion

**NATURE OF PROCEEDINGS:** Hearing on Motion to Quash Service of Summons for Lack of

Personal Jurisdiction By Specially Appearing Defendant Homeaway.Com, Inc.

The Court's tentative ruling is provided to all sides via the Court's website.

The matter is called for hearing.

The Court's tentative ruling is adopted as the Order of the Court as follows:

Case Number: 20STCV22663 Hearing Date: February 22, 2021 Dept: 34 SUBJECT: Motion to Quash Service of Summons and Complaint for Lack of Personal Jurisdiction

Moving Party: Specially-Appearing Defendant Homeaway.com, Inc.

Resp. Party: Plaintiff Karen Schwartz

The motion to quash service of summons and complaint for lack of personal jurisdiction is GRANTED.

Specially-Appearing Defendant's evidentiary objections are SUSTAINED.

BACKGROUND:

This action arises out of allegations that "on September 17, 2019, Plaintiff Karen Schwartz was severely injured, suffering a severe fracture to her right lower leg, after falling down the improperly maintained stairs of the rental property she was staying [*2] in at 6627 Emmet Terrace, Los Angeles, CA 90068, … which, … is owned, leased, operated, maintained, and controlled by Defendant Tess Poblete, Defendant Stephen R. Tagud,

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

Defendant Riboch Holdings international, LLC, and Defendant Homeaway.com, Inc." (Complaint, ¶ 1.)

On June 16, 2020, Plaintiff Karen Schwartz commenced this action against Defendants Tess Poblete, Stephen R. Tagud, Riboch Holdings, LLC, and Homeaway.com, Inc. for (1) negligence; (2) negligence per se; and (3) premises liability.

On August 25, 2020, Specially-Appearing Defendant Homeaway.com, Inc. ("Specially-Appearing Defendant") filed the instant motion to quash service of summons and complaint for lack of personal jurisdiction.

ANALYSIS:

I. Motion to Quash Service of Summons

A. Evidentiary Objections

The Court rules as indicated on specially-appearing Defendant's evidentiary objections to the declaration of Brianna Y. Franco:

Objection

1-SUSTAINED

2-SUSTAINED

3-SUSTAINED

4-SUSTAINED

5-SUSTAINED

6-SUSTAINED

7-SUSTAINED

8-SUSTAINED

9-SUSTAINED

10-SUSTAINED

B. Legal Standard

"A defendant, on or before the last day of his or her time to plead or within any further time that the court may for good cause allow, may serve and file a notice [*3] of motion for one or more of the following purposes: (1) To quash service of summons on the ground of lack of jurisdiction of the court over him or her." (*Code Civ. Proc., § 418.10, subd. (a)*.)

In California, courts are authorized to "exercise jurisdiction over parties on any basis not inconsistent with the Constitution of [California] or the United States." (*Code Civ. Proc., § 410.10*.) "Personal jurisdiction may be either general or specific." (*Vons Companies, Inc. v. Seabest Foods, Inc. (1996) 14 Cal.4th 434, 445, 58 Cal. Rptr. 2d 899, 926 P.2d 1085*.) The extent to which a California court may exercise jurisdiction over a defendant depends on the nature and quality of that defendant's contacts with the state.

Nonresident defendants whose commercial activities impact California on a substantial, continuous, and systematic basis are subject to general jurisdiction in California. (See *Vons Companies, 14 Cal.4th at pp. 445-446*.) However, if the defendant's activities in California are insufficient to justify the exercise of general jurisdiction over him or her, then the cause of action must arise out of an act done or transaction consummated in the forum such that the defendant may

be subject to specific jurisdiction. (*Cornelison v. Chaney (1976) 16 Cal.3d 143, 147-148, 127 Cal. Rptr. 352, 545 P.2d 264*.)

A plaintiff "bears the burden of proof by a preponderance of evidence to demonstrate the defendant has sufficient minimum contacts with the forum state to justify jurisdiction." [*4] (*Thomson v. Anderson (2003) 113 Cal.App.4th 258, 266, 6 Cal. Rptr. 3d 262*.) The Court must assess each defendant's contacts with the forum state individually. (*Anglo Irish Bank, PLC v. Superior Court (Brar) (2008) 165 Cal.App.4th 969, 978, 81 Cal. Rptr. 3d 535*.)

C. Discussion

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

Specially-Appearing Defendant moves to quash the service of summons and complaint for lack of personal jurisdiction "on the grounds that this court lacks personal jurisdiction over HomeAway because it is not present and does not reside in the State of California, because there are insufficient contacts between HomeAway and the State of California to properly subject it to the jurisdiction of California's courts, and because there are no viable claims against HomeAway." (Notice of Motion, pp. 1:24-2:5.)

1. Procedural Issue

"A plaintiff is generally entitled to conduct discovery with regard to a jurisdictional issue before a court rules on a motion to quash." (*Goehring v. Superior Court (Bernier) (1998) 62 Cal.App.4th 894, 911, 73 Cal. Rptr. 2d 105.*) "In order to prevail on a motion for a continuance for jurisdictional discovery, the plaintiff should demonstrate that discovery is likely to lead to the production of evidence of facts establishing jurisdiction." (*In re Auto. Antitrust Cases I & II (2005) 135 Cal. App. 4th 100, 127, 37 Cal. Rptr. 3d 258.*)

In opposition, Plaintiff argues that "should the court be inclined to grant HomeAway's motion, due to the discovery games that HomeAway has engaged in, Plaintiff respectfully requests that the Court continue this [*5] motion to quash hearing ninety (90) days so that Plaintiff can conduct the jurisdictional discovery that it [sic] is entitled to." (Opp., p. 15:1-4.) Plaintiff asserts that "jurisdictional discovery is likely to lead to the production of evidence of facts establishing jurisdiction here." (Id. at p. 14:22-23, citing Franco Decl., ¶ 11.) Plaintiff maintains that she "served jurisdictional interrogatories on HomeAway on October 27, 2020 and HomeAway served deficient responses to these interrogatories on November 30, 2020." (Id. at p. 14:23-25, citing Franco Decl., ¶¶ 9-10, Exs. 8-9.) Plaintiff contends that "Defendant served straight objections with no substantive responses to all questions except for one." (Id. at p.

14:25-26, citing Franco Decl., ¶¶ 9-10, Exs. 8-9.) Plaintiff asserts that "as a result of the close proximity of Plaintiff's deadline to oppose this motion, Plaintiff did not have enough time to meet and confer regarding these responses." (Id. at pp. 14:26-15:1, citing Franco Decl., ¶ 11.)

In reply, Specially-Appearing Defendant first maintains that "Plaintiff had ample opportunity, and did in fact, serve jurisdictional discovery requests consisting of eight interrogatories [*6] which … were not related to the jurisdictional issues before this Court." (Reply, p. 9:14-16.) Specially-Appearing Defendant argues that "served timely responses which would have allowed five days for Plaintiff to meet and confer, utilize those responses in her Opposition, or otherwise seek Court intervention-but Plaintiff declined to take any action." (Id. at p. 9:16-18.) Specially-Appearing Defendant asserts that "for failure to act, equity requires Plaintiff should be denied any request for additional opportunities to conduct jurisdictional discovery requested in her Opposition." (Id. at p. 9:18-20.) Second, Specially-Appearing Defendant argues that "Plaintiff altogether fails to meet her burden to establish a basis for additional jurisdictional discovery." (Id. at p. 9:21-22.) Specially-Appearing Defendant contends that Plaintiff's Opposition does not identify any additional jurisdictional discovery she would seek or why such discovery would be relevant." (Id. at p. 9:24-25.) Further, Specially-Appearing Defendant asserts that "Plaintiff argues that HomeAway's responses were deficient, but fails to identify any specific deficiencies or explain why she would be entitled to responses." [*7] (Id. at p. 9:25-27.) Specially-Appearing Defendant also argues that "even if Plaintiff could identify new and appropriate jurisdictional discovery, she has failed to explain why she did not seek such information in her first set of jurisdictional discovery requests in the first place." (Id. at p. 10:1-3.)

The Court finds that Plaintiff has not demonstrated that a second set of jurisdictional discovery is likely to lead to the production of evidence of facts

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

establishing jurisdiction. (See *In re Auto. Antitrust Cases I & II, supra, 135 Cal.App.4th at p. 127*.) Plaintiff has not explained why the first set of jurisdictional responses were deficient or what facts a second set of jurisdictional discovery would produce.

The Court DENIES Plaintiff's request for a continuance to conduct jurisdictional discovery.

2. General Jurisdiction

An individual is subject to general jurisdiction in the state of his or her domicile; while for a corporation it is where it is "fairly regarded as home." (*Goodyear Dunlop Tires Operations, S.A. v. Brown (2011) 564 U.S. 915, 924, 131 S. Ct. 2846, 180 L. Ed. 2d 796* (Goodyear).) This is where the corporation's contacts are "so 'continuous and systematic' as to render [the defendant] essentially at home in the forum state." (*Daimler AG v. Bauman (2014) 571 U.S. 117, 139, 134 S. Ct. 746, 187 L. Ed. 2d 624* (Daimler AG).) In Goodyear and Daimler AG, for corporations, the U.S. Supreme Court held that general jurisdiction [*8] exists only in the defendant's (1) state of incorporation and (2) principal place of business. (See Goodyear, supra, 564 U.S. at p. 294; *Daimler AG, supra, 571 U.S at p. 137*.)

Plaintiff alleges that "Jurisdiction and Venue are proper in the County of Los Angeles pursuant to *§ 395(a) of the California Code of Civil Procedure.* The accident giving rise to the injuries sustained by Plaintiff Schwartz occurred in the city and county of Los Angeles at 6627 Emmet Terrace, 90068." (Complaint, ¶ 3.)

Plaintiff also alleges that "Defendant Homeaway.com, Inc. is, and at all relevant time was, a corporation organized and existing pursuant to the laws of the State of Delaware. Homeaway.com is wholly owned by HomeAway Holdings, Inc., a Delaware Corporation, which in turn is wholly owned by Expedia, Inc., a publicly held Delaware Corporation. Homeaway operates short-term rental websites that allow homeowners,

both nationally and in California and Los Angeles, to advertise residential properties for rent and travelers to inquire and book these properties." (Id. at ¶ 8.)

Specially-Appearing Defendant Homeaway.com, Inc. argues that it is not subject to general jurisdiction and it "is not 'at home' in California because:

· HomeAway is not incorporated in California (see Dec. Miers ¶ [*9] 4);

· HomeAway's principal place of business is not in California (see id.);

· HomeAway does not maintain an office, address, or telephone number in California (id. ¶ 14);

· HomeAway does not maintain a bank account or investment account in California (id. ¶ 16);

· HomeAway does not own or lease any real property in California (id. ¶ 12);

· HomeAway's headquarters are not located in California (id. ¶ 15);

· HomeAway does not regard California as its 'home' state. (Id. ¶ 17.)." (MPA, p. 11:10-19.)

Specially-Appearing Defendant argues that "Plaintiff's vague and conclusory allegations that HomeAway operates short-term rental websites which 'allow homeowners, both nationally and in California and Los Angeles, to advertise residential properties for rent,' (see Compl. ¶ 8), are insufficient to establish that HomeAway is subject to general jurisdiction in California." (Id. at p. 11:23-26.) Specially-Appearing Defendant maintains that "this conclusory allegation must be ignored because Plaintiff has the burden of coming forward with specific evidentiary facts … demonstrating not only that HomeAway conducts business in California, but also that such business is so 'substantial' that HomeAway is [*10] 'at home' in California." (Id. at pp. 11:28-12:3.) Specially-Appearing Defendant argues that its "ownership

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

and operation of generally accessible websites like HomeAway.com does not make it subject to the general jurisdiction in California." (Id. at p. 12:4-6.) Overall, Specially-Appearing Defendant maintains that its "contact with California is insubstantial, passive, and below the threshold to consider it 'at home' and 'physically present' in California." (Id. at p. 12:21-22.)

In opposition, Plaintiff argues "the Court has general jurisdiction over HomeAway because HomeAway has sufficient 'minimum contacts' with California." (Opp., p. 7:22-23.) Plaintiff asserts that "HomeAway's minimum contacts with California derive from the thousands of California homeowners, travelers, and California-bound travelers that HomeAway.com contracts with and collects payment from on a continuous basis." (Id. at p. 8:26-28.) Plaintiff maintains that "HomeAway has substantial, continuous, and systematic activities within California- stemming primarily with its direct relationships and contracts with California residents, homeowners, and travelers to California-including the popular destination of Los [*11] Angeles." (Id. at pp. 8:28-9:3.) Plaintiff argues that "when California homeowners (or as Homeaway calls them, 'Members,') sign up to list their homes on Homeaway.com (now Vrbo.com), there is a multi-step process which includes (1) Setting up the property by explaining what's unique, show off with photos, and set the right price,' [sic] (2) Start earning: 'We'll [Homeaway.com] help you collect payment, deduct a commission, and send you the balance, and (3) Get the perfect match: 'We'll connect you with travelers from home and abroad.'" (Id. at p. 9:3-8, citing Franco Decl., ¶ 5, Ex. 4, emphasis in Opposition.)

Plaintiff maintains that Specially-Appearing Defendant "knowingly and purposefully interacts with, and collects payments from California members/citizens/homeowners and California renters/travelers alike." (Id. at p. 9:10-11, citing Franco Decl. ¶ 5, Ex. 4.) Plaintiff asserts that "this includes sending the balance to California residents

(as is the case here,) in addition to connecting the California homeowner, fellow Defendants Tess Poblete and Stephen R. Tagud, with Plaintiff." (Id. at p. 9:11-13.) Plaintiff argues that "HomeAway is not a passive online marketplace-it directly [*12] interacts with its California members and travelers/renters." (Id. at p. 9:13-15, citing Franco Decl., ¶ 5, Ex. 4.)

In reply, Specially-Appearing Defendant argues that "Plaintiff fails to provide any evidence relevant to the correct legal standard, set forth above, tending to prove general jurisdiction exists over HomeAway, i.e.: (1) that HomeAway is incorporated in California; (2) that HomeAway has its principal place of business in California; or (3) that HomeAway is 'at home' in California." (Reply, p. 4:6-9.) Specially-Appearing Defendant asserts that Plaintiff's reliance "solely on print outs [sic] from Vrbo.com in an attempt to establish that HomeAway 'knowingly and purposefully interacts' with California residents … is insufficient to meet Plaintiff's burden in opposing a motion to quash for lack of personal jurisdiction." (Id. at p. 4:10-13.) Specially-Appearing Defendant argues that first, "there is no evidentiary foundation in the record to establish these websites were, or ever have been, identical." (Id. at 4:16-17.) Specially- Appearing Defendant contends that "these exhibits are not admissible and, even if they were, they would have no probative value." (Id. at p. 4:17-18.) [*13]

Second, Specially-Appearing Defendant argues that "even if Plaintiff's website printouts were deemed to be admissible as exhibits and accurately depicted HomeAway.com at the relevant time period, the contention Plaintiff seeks to establish (that HomeAway 'knowingly and purposefully interacts' with California residents through its website) is nevertheless substantively insufficient to establish general jurisdiction." (Id. at p. 4:19-23.)

The Court finds that Plaintiff has not presented evidence to demonstrate that general jurisdiction of Specially-Appearing Defendant exists. Specially-Appearing Defendant's state of incorporation and

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

principal place of business are not in California; Plaintiff does not contend otherwise. (See Goodyear, supra, 564 U.S. at p. 294; *Daimler AG, supra, 571 U.S at p. 137*.) Plaintiff also fails to provide admissible evidence demonstrating that Specially-Appearing Defendant's contacts with California are "so 'continuous and systematic' as to render [Specially-Appearing Defendant] essentially at home in" California." (*Daimler AG, supra, 571 U.S. at p. 139*.) Plaintiff fails to properly authenticate the print-outs of the website. Plaintiff also fails to show that the evidence of the print-outs of the website accurately depict Specially-Appearing Defendant's contacts with [\*14] California at the relevant time period of the events giving rise to this action. The Court has sustained the objections to this evidence.

Further, from the evidence presented to the Court, general jurisdiction of Specially-Appearing Defendant does not exist because Specially-Appearing Defendant's state of incorporation is Delaware and its principal place of business is in Texas. (Miers Decl., ¶¶ 5, 13-17; see Goodyear, supra, 564 U.S. at p. 294; *Daimler AG, supra, 571 U.S at p. 137*.) Therefore, the Court does not have general jurisdiction over Specially-Appearing Defendant.

### 3. Specific Jurisdiction

The California Supreme Court has held that three requirements must be met before specific jurisdiction may be exercised: (a) defendant purposefully availed himself of the forum benefits, (b) the controversy is related to or arises from defendant's contacts with California, and (c) the assertion of jurisdiction would comport with fair play and substantial justice. (*Pavlovich v. Sup. Ct. (2002) 29 Cal.4th 262, 269, 127 Cal. Rptr. 2d 329, 58 P.3d 2*.) "A plaintiff opposing a defendant's motion to quash service has the burden of establishing factor Nos. (1) (the defendant's purposeful availment) and (2) (lawsuit relates to defendant's contacts with state)." (*People ex rel. Harris v. Native Wholesale Supply Co. (2011) 196*

*Cal.App.4th 357, 362, 126 Cal. Rptr. 3d 257*, citing *Bridgestone Corp. v. Superior Court (2002) 99 Cal.App.4th 767, 774, 121 Cal. Rptr. 2d 673*].) "If the plaintiff does so, the burden then shifts to the defendant to show [\*15] factor No. (3), that the exercise of jurisdiction would be unreasonable." (Ibid.)

#### a. Purposeful Availment

"The nonresident defendant must have purposefully directed its activities at forum residents, or purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of local law." (Weil & Brown, Civ. Proc. Before Trial (The Rutter Group 2020) ¶ 3:226.) When individuals "purposefully derive benefit" from their interstate activities, it is unfair to allow such individuals to escape having to account for their activities in the state from which they purposefully derived a benefit, for the consequences that arise from such activities. (*Burger King (1985) 471 U.S. 462, 471-474, 105 S. Ct. 2174, 85 L. Ed. 2d 528*.) Minimum contacts can be electronic or created through the use of the telephone, mail, or e-mail. (*Hall v. LaRonde (1997) 56 Cal.App.4th 1342, 1344, 1346-1347, 66 Cal. Rptr. 2d 399*.) What is important "is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." (*World-Wide Volkswagen Corp. v. Woodson (1980) 444 U.S. 286, 287, 100 S. Ct. 559, 62 L. Ed. 2d 490*.)

"[E]ven where other parties involved in the action have considerable contacts with California, if the nonresident defendant did not evidently intend to conduct business in California or in any other way directly or indirectly [\*16] gain from California dealings, the purpose of the other parties cannot be imputed to the nonresident defendant for the purpose of assuming personal jurisdiction over him. [Citation.] Thus, "… jurisdiction over a nonresident must be based on an analysis of the relationship between that defendant and the forum state. [Citation.]" [Citation.]" (*Edmunds v. Superior*

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

*Court (1994) 24 Cal.App.4th 221, 231, 29 Cal. Rptr. 2d 281*.) In order to establish personal jurisdiction over the nonresident defendant, the plaintiff must proffer "evidence of express aiming or intentional targeting." (*Pavlovich, supra, 29 Cal.4th at p. 273*.)

"'The purposeful availment inquiry … focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum. [Citation.] Thus, the '"purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts [citations], or of the 'unilateral activity of another party or a third person.' [Citations.]" [Citation.] "When a [defendant] 'purposefully avails [*17] itself of the privilege of conducting activities within the forum State,' [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." [Citation.]" (*Id. at p. 269*.)

When determining if a defendant's contacts with the forum state is sufficient to confer specific jurisdiction based solely on internet use, the California Supreme Court has adopted a sliding scale analysis. (*Id. at p. 274*.) "'At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. [Citation.] At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. [*18] [Citation.] The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.' [Citation.] …

'Creating a site, like placing a product into the stream of commerce, may be felt nationwide-or even worldwide-but, without more, it is not an act purposefully directed toward the forum state.'" [Citation.] Otherwise, 'personal jurisdiction in Internet-related cases would almost always be found in any forum in the country.' [Citation.] Such a result would 'vitiate long-held and inviolate principles of' personal jurisdiction. [Citation.]" (*Id. at pp. 274-275*.)

In *Shisler v. Sanfer Sports Cars, Inc. (2006) 146 Cal.App.4th 1254, 1261, 53 Cal. Rptr. 3d 335*, the appellate court found that a website that advertised a company's vehicles and included a credit application through which customers submitted personal information was not a sufficient basis for personal jurisdiction. The Shisler court found that there was no "evidence that anything about the website targeted California residents" and therefore the "defendant's maintenance of the Web site alone [was] insufficient to establish [*19] personal jurisdiction." (Ibid.)

Specially-Appearing Defendant argues that it "did not purposefully avail itself of the benefits and protections of California" and that Plaintiff cannot demonstrate that Specially-Appearing Defendant did so by a preponderance of the evidence. (MPA, p. 13:7-8, 13:16-17.) Specially-Appearing Defendant asserts that it "is not a contractual party to any rental agreement, it does not own any property, nor is it responsible for the safety and maintenance of properties listed on its websites." (Id. at p. 13:17-19, citing Miers Decl., ¶¶ 8-13.) Specially-Appearing Defendant maintains that

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

"while Plaintiff vaguely alleges that HomeAway operates websites that 'allow homeowners, both nationally and in California and Los Angeles, to advertise residential properties for rent,' (see Compl. ¶ 8, emphasis added), an advertisement placed by a property owner or manager (see Dec. of B. Miers ¶¶ 4, 6; Dec. of C. Davis ¶ 3) would not, alone, amount to 'significant activities' within the State to establish purposeful availment by HomeAway sufficient for this Court's exercise of specific personal jurisdiction over HomeAway." (Id. at p. 13:19-24.) Specially-Appearing Defendant [*20] also argues that it has not purposefully availed itself of the benefits and protections because its "websites are not expressly aimed at California." (Id. at p. 14:17, citing Davis Decl., ¶¶ 4-5.) Specially-Appearing Defendant contends that it "merely makes its websites generally available to residents of any State (and internationally to anyone looking to book properties across the globe), and its websites are not limited solely to California rental properties." (Id. at p. 14:18-20, citing Davis Decl., ¶¶ 4-5.) Specially-Appearing Defendant also argues that "Plaintiff will be unable to establish that HomeAway purposefully availed itself of the privilege of doing business in the State of California, especially as Plaintiff has made no specific allegations that HomeAway 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" (Id. at p. 14:24-27.)

Plaintiff argues that "HomeAway, including its subsidiaries such as Vrbo, have engaged in significant business activities in California, purposefully availing itself to the privileges of conducting business in this State." (Opp., p. 11:3-5.) Plaintiff maintains that "on HomeAway.com's [*21] current website, the website gives travelers lists of suggestions for 'cabins,' 'vacation ideas,' and 'top destinations" and "from these categories, seven of the suggestions are cities in California-Big Bear, Lake Tahoe cabins, South Lake Tahoe cabins, San Diego, Palm Springs." (Id. at p. 11:5-8, citing Franco Decl., ¶8,

Ex. 7.) Plaintiff argues that "by making these travel suggestions to consumers and potential travelers, there can be no doubt, or surprise, that HomeAway be expected to be hailed to California for causes of actions related to these bookings." (Id. at p. 11:8-10.) Plaintiff argues that "therefore, it is clear that HomeAway has purposefully availed itself to California due to these suggestions to potential travelers that they should consider booking California rental properties and travel to California." (Id. at p. 11:18-20.) Plaintiff asserts that "given the popularity of rental properties, it is more likely than not that HomeAway has generated well more than $2 million dollars in sales revenue from its California listings-making California's jurisdiction over HomeAway appropriate and reasonable- consistent with California case law." (Id. at p. 12:8-10.) Overall, Plaintiff [*22] maintains that "HomeAway has obtained the benefits and protections of California's laws through its numerous transactions with California residents and thus, the requirement of purposeful availment is satisfied." (Id. at p. 11:15-17.)

In reply, Specially-Appearing Defendant maintains that "it is not obvious, and cannot be assumed, that HomeAway targets Californians interested in booking a property merely because homeowners and property owners chose to use HomeAway's platform to list California properties for short term rentals." (Reply, p. 6:17-19.) Further, Specially-Appearing Defendant asserts that the undisputed evidence directly contradicts Plaintiff's assumption because Defendant has shown that "those websites are not directed at Travelers from any particular state, including California" and "those websites do not target California resident Travelers more, or differently, than Travelers from any other State … ." (Id. at p. 6:19-22, citing Davis Decl., ¶¶ 3-5.) Specially-Appearing Defendant argues that its "affirmative evidence submitted in support of this Motion establishing that it does not target California residents more than residents of any other state is sufficient to negate [*23] the element of purposeful availment." (Id. at p. 7:7-9, citing Davis Decl., ¶¶ 4-5.) Specially-Appearing

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

Defendant contends that "Plaintiff does not provide any evidence or authority to the contrary, and therefore has not carried her burden establishing that HomeAway's website activity constitutes purposeful availment." (Id. at p. 7:10-11.)

Specially-Appearing Defendant also argues that "Plaintiff's suggestion that HomeAway has engaged in 'numerous transactions with California residents,' (see Oppo. at 11), is unsupported by evidence." (Id. at p. 7:12-13.) Specially-Appearing Defendant asserts that it "provided affirmative evidence establishing that it is not a contractual party to any rental agreement (including the subject rental agreement), it does not own any rental properties, nor is it responsible for the safety and maintenance of properties listed on its websites." (Id. at p. 7:13-17, citing Miers Decl., ¶¶ 8-13.) Specially-Appearing Defendant maintains that "Plaintiff does not provide any evidence to dispute this fact, and therefore has not carried her burden establishing that HomeAway engages in business within the state." (Id. at p. 7:17-18.)

The Court finds that Plaintiff [*24] has failed to carry her burden establishing by a preponderance of the evidence that Specially-Appearing Defendant has purposefully availed itself of the benefits and protections of California to justify specific jurisdiction. Plaintiff has failed to provide evidence to establish that Specially-Appearing Defendant's website advertising the third party rental options specifically targeted California residents. Instead, Specially-Appearing Defendant provides undisputed evidence that it operates certain websites that allows third-party property owners and managers to list their properties for short-term rent and connect with individuals who are seeking to rent a property, referred to as Travelers, and these websites "are not targeted at Travelers from any particular state, including California." (Davis Decl., ¶¶ 3-4.) Further, Plaintiff does not provide evidence to contradict Specially-Appearing Defendant's evidence that the "websites do not target California resident Travelers more, or differently, than Travelers from any other State."

(Id. at ¶ 4.) Plaintiff also fails to present evidence to dispute that "instead of targeting potential Travelers from any particular state or area, HomeAway [*25] makes its websites available domestically and internationally - generally, to anyone who seeks out those websites on the internet, regardless of where they live." (Ibid.) Further, the undisputed evidence demonstrates that "with respect to California residents looking to rent vacation properties, HomeAway does not purposefully or deliberately direct or target any marketing to them differently than it targets any other residents of other states." (Id. at ¶ 5.)

Similar to Shisler, Plaintiff fails to provide evidence that Specially-Appearing Defendant's website specifically targeted California residents and the Court finds that Specially-Appearing Defendant's mere maintenance of the website advertising the third-party property rentals is insufficient to establish personal jurisdiction. (See *Shisler, supra, 146 Cal.App.4th at p. 1261*.) Therefore, Plaintiff has not carried her burden to establish the "purposeful availment" prong of the test for specific jurisdiction.

The Court GRANTS Specially-Appearing Defendant's motion to quash service of summons for lack of personal jurisdiction.

The Motion to Quash Service of Summons and Complaint for Lack of Personal Jurisdiction By Specially Appearing Defendant Homeaway.Com, Inc. filed by Homeaway.com, [*26] Inc. on 08/25/2020 is Granted.

Plaintiff is to file amended complaint and give notice.

**End of Document**

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

COPY

# EXHIBIT 4

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

Filed: 08/18/2023 15:27:38
Third Judicial District, Gem County
Shelly Tilton, Clerk of the Court
By: Deputy Clerk - Puentes, Rachel

IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF THE

STATE OF IDAHO, IN AND FOR THE COUNTY OF GEM

| | |
|---|---|
| MARCUS BENDON,<br><br>          Plaintiff,<br><br>vs.<br><br>SHOOTING STAR LODGE ISLAND PARK, LLC; RISING SUN RANCH; AIRBNB, INC; AIRBNB INSURANCE AGENCY LLC; AIRBNB PAYMENTS, INC.,<br><br>          Defendants. | **CASE NO. CV23-22-0566**<br><br>**ORDER RE: MOTION TO DISMISS** |

Defendants Airbnb, Inc. ("Airbnb"), Airbnb Insurance Agency LLC, and Airbnb

Payments, Inc. (collectively, "Airbnb entities") have filed a Motion to Dismiss Plaintiff Marcus

Bendon's claim against them based upon a lack of personal jurisdiction pursuant to Idaho Rules

of Civil Procedure 4.1 and 12(b)(2). For the foregoing reasons, the Court GRANTS the Motion.

### FACTUAL AND PROCEDURAL BACKGROUND

This personal injury/premises liability case arose from events alleged on August 20,

2020. Plaintiff alleges he fell through the floor of a cabin property owned and operated by

Defendant Shooting Star Lodge Island Park, LLC, under the business name Rising Sun Ranch.

Plaintiff used Airbnb's website to book his stay at the cabin, located in Island Park, Idaho.

Plaintiff's primary residence is in the State of Montana.

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

**Page 1**

COPY

The origin and status of the Airbnb entities vary somewhat. The primary Airbnb entity has its principal place of business in California and was incorporated under Delaware law. The "Payments" entity also has its principle place of business in California, and is also incorporated under Delaware law. The "Insurance" entity was also formed under Delaware law but its principal place of business is New York. Both the "Insurance" and "Payment" entities are registered in Idaho as foreign companies. However, there have been no allegations nor facts submitted by which the Court could determine whether either of those Airbnb entities transact business in or related to Idaho, nor is there any assertion that any such transaction would have any relation to the Plaintiff's alleged injuries.

Airbnb conducts business through its internet website. On this website, property owners offer properties to be rented by guests. Airbnb provides payment and insurance services to the host as part of its function as a platform that facilitates these transactions, and enters into an agreement with the host to have the property listed on Airbnb's platform. There is no allegation or evidence that Airbnb otherwise manages or controls the rental properties listed by a host, although Airbnb admits that it can take steps to delist property from the website. Airbnb receives a commission from the rental fees that result from these transactions between the host and the guest. Airbnb also receives a fee paid directly by the guest for each booking. Airbnb has several hundred listings of properties for rent throughout the State of Idaho.

Airbnb argues that it does not have the requisite ties to be hailed into an Idaho court under either general or specific personal jurisdiction. Plaintiff has opposed the Motion, arguing that those requisite ties do exist under both theories of personal jurisdiction.

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

## LEGAL STANDARDS

A motion to dismiss under I.R.C.P. 12(b)(2) for lack of personal jurisdiction is subject to the same standard as summary judgment orders. *Griffin v. Ste. Michelle Wine Estates LTD*, 169 Idaho 57, 65, 491 P.3d 619, 627 (2021). When affidavits are submitted in support or opposition to a motion to dismiss, the Court will treat the motion as one for summary judgment. *Hayes v. Conway*, 144 Idaho 503, 506-07, 163 P.3d 1215, 1218-19 (Ct. App. 2007). Summary judgment is appropriate when the pleadings, affidavits, and discovery documents before the Court indicate no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Montgomery v. Montgomery*, 147 Idaho 1, 4, 205 P.3d 650, 654 (2008), Idaho R. Civ. Proc. 56(c). The burden of establishing the absence of a genuine issue of material fact rests with the party moving for summary judgment. *Finholt v. Cresto*, 143 Idaho 894, 896-97, 155 P.3d 695, 697-98 (2007). Once a moving party has made a case for the absence of a genuine issue of material fact, the burden shifts to the non-moving party to provide specific facts showing there is a genuine issue. *Kiebert v. Goss*, 144 Idaho 225, 228, 159 P.3d 862, 864 (2007). The non-moving party must come forward with evidence by way of affidavit or otherwise that contradicts the evidence submitted by the moving party and establishes the existence of a genuine issue. *Chandler v. Hayden*, 147 Idaho 765, 769, 215 P.3d 485, 489 (2009). The record must be construed in the light most favorable to the party opposing the motion, and all reasonable inferences must be drawn in that party's favor. *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 238, 108 P.3d 380, 385 (2005).

"The question of the existence of personal jurisdiction over an out-of-state defendant is one of law," subject to free review. *Dickinson Frozen Foods, Inc. v. J.R. Simplot Co.*, 164 Idaho 669, 677, 434 P.3d 1275, 1283 (2019). Personal jurisdiction can either be general or specific.

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

General personal jurisdiction applies where the substantial contacts test is met for purposes of due process. The substantial contacts test is met when there are "instances in which the continuous corporate operations with a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Griffin*, 169 Idaho at 67, 491 P.3d at 629 (quoting *International Shoe Co. v. State of Wash., et al.*, 326 U.S. 310, 318 (1945)).

If a court lacks general personal jurisdiction over an out-of-State defendant, there must be a "legal basis for the assertion of extraterritorial [specific personal] jurisdiction" *Knutsen v. Cloud*, 142 Idaho 148, 150, 124 P.3d 1024, 1026 (2005). In order for an Idaho court to properly exercise specific personal jurisdiction over a non-resident defendant, two requirements must be met: "(1) the non-resident's actions must fall within the scope of Idaho long-arm statute; and (2) jurisdiction over the non-resident must not violate the defendant's due process rights." *Profits Plus Capital Mgmt., LLC v. Podesta*, 156 Idaho 873, 881, 332 P.3d 785, 793 (2014).

## ANALYSIS

### I. General Personal Jurisdiction

General personal jurisdiction may be exercised when there are "instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Griffin*, 169 Idaho at 67, 491 P.3d at 629. Finding general jurisdiction over a non-resident defendant is considered to be extremely rare, even among the federal courts where questions of general personal jurisdiction are more often addressed. *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1224 (9th Cir. 2011). In discussing the only time the United

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

States Supreme Court has found general personal jurisdiction over a non-resident defendant, the

Ninth Circuit explained:

> The Supreme Court has found general personal jurisdiction over a non-resident defendant in only one case, although it did not use the term "general jurisdiction" in its opinion. The Court has recently described *Perkins* as the "textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum." The facts of *Perkins* illustrate the nature and extent of the contacts required for general jurisdiction. The defendant was a Philippine corporation whose mining operations were suspended while the Japanese occupied the Philippines during World War II.The corporation's president, who was also its general manager and principal stockholder, returned to his home in Ohio, where he ran a corporate office. The president kept business files in Ohio; handled corporate correspondence from Ohio; drew employees' salaries from accounts in Ohio banks and distributed paychecks; held directors' meetings while he was in Ohio; and "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." Plaintiff's "cause of action ... did not arise in Ohio and [did] not relate to the corporation's activities there." But because of the nature and extent of the corporation's activities in the state, "Ohio was the corporation's principal, if temporary, place of business." The Court therefore upheld the exercise of personal jurisdiction over the corporation in Ohio.

*Id*. (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447-48 (1952)). *See, e.g.,*

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011) (state did not have

general jurisdiction over European tire company where tire company was not registered to do

business in the state, had no place of business, employees or bank accounts in the state; and did

not control or sell the tens of thousands of tires that made their way into the state); *Keeton v.*

*Hustler Magazine, Inc.*, 465 U.S. 770 (1984) (denying general jurisdiction in New Hampshire

over Ohio corporation that circulated thousands of copies of magazines per month in New

Hampshire); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984)

(Columbian corporation not subject to general jurisdiction in Texas even though corporate CEO

went to Texas to negotiate contract, spent millions to purchase majority of its inventory from

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

Texas supplier, trained employees in Texas, sent managers to Texas for consultation, and received millions of dollars in payments facilitated by Texas bank).

Here, the record does not reflect the kind of substantial contacts that are required by law for the exercise of specific personal jurisdiction. Airbnb has no place of business here, and there is no indication that it engages in any activity within Idaho other than facilitating property rentals through its website. While Airbnb or one or more of its entities made certain filings with the Idaho Secretary of State, the Court is not convinced that this demonstrates any substantial, systematic, and continuous contacts, and Plaintiff provides no authority for the proposition that this invokes general personal jurisdiction. *See Mallory v. Norfolk S. Ry. Co.*, 266 A.3d 542, 547 (PA. 2021).  Although Airbnb may receive a pecuniary interest by virtue of commissions received from listing hundreds of Idaho properties on its website, its role in facilitating an agreement between the hosts and guests appears to be so passive that its receipt of a pecuniary interest does not create substantial and systematic contacts with the state.

Plaintiff urges that the sheer volume of these listings speaks to substantial systematic contacts, but the number of contacts does not in and of itself satisfy the requirement of substantial contacts as contemplated in decisions from the U.S. Supreme Court. The Ninth Circuit rejected a similar argument in *Mavrix.* In that case, the plaintiff claimed the defendant "allows third parties to advertise jobs, hotels, and vacations in California on its website; sells or allows a third party vendor to sell, tickets to California events on its website; employs a California firm to design its website; has business relationship with a California-based national news organization, an Internet advertising agency, and a wireless provider; and maintains a 'highly interactive website.'" *Mavrix*, 647 F.3d at 1225. Like the Defendant in *Mavrix*, Airbnb "allows other [parties] to solicit business by taking advantage of [the website's] existing user

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

base," as opposed to targeting Idaho residents and marketing its own products or services. *Id*. at 1226.

Reviewing the record as a whole and construing it in a light most favorable to Plaintiff, the Court does not have general personal jurisdiction over the Airbnb Defendants.

## II.     Specific Personal Jurisdiction

### A.     Idaho's Long Arm Statute

When determining specific personal jurisdiction, the first issue to address is the applicability of Idaho's long-arm statute. Where general jurisdiction focuses on the Defendant's "presence" in the state, specific jurisdiction focuses on the Defendant's "activities" within the state. *Griffin*, 169 Idaho at 66, 491 P.3d at 628.  Idaho's long-arm statute provides for the exercise of jurisdiction over claims arising out of the "transaction of any business within this state." I.C. §5-514(a). The long-arm statute goes on to define business transaction as "the doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact, or enhance the business purpose or objective or any part thereof of such person, firm, company, association or corporation." *Profits Plus*, 156 Idaho at 873, 332 P.3d at 793 (quoting I.C. §5-514(a)). Idaho's long-arm statute is to be liberally construed. *Purco Fleet Servs., Inc. v. Idaho State Dep't of Fin.*, 140 Idaho 121, 124, 90 P.3d 346, 349 (2004). Thus, whether a transaction occurred must first be ascertained. Next, the Court must determine whether the cause of action arose from such transaction(s) in order for Idaho's long-arm statute to apply. *Knutsen*, 142 Idaho at 151, 124 P.3d at 1027.

### 1.   Transacting Business

In determining whether a defendant transacted business as defined under Idaho's long-arm statute, the Court "look[s] to the specific facts of each case to determine whether an out-of-

**Page 7**

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

state defendant has transacted business within the state." *Brockett Company, LLC v. Crain*, 168 Idaho 375, 380-81, 483 P.3d 432, 437-38 (2021). In examining such facts, "the defendant's conduct is the critical inquiry." *Gailey v. Whiting*, 157 Idaho 727, 731, 339 P.3d 1131, 1135 (2014).

Here, the critical facts are as follows: neither Airbnb, nor any of its entities, has its principal place of business in Idaho, nor are they incorporated under Idaho law. Airbnb does, however, contract with Idaho residents or businesses based in Idaho to facilitate the listing of property, also located in Idaho, to be rented by third-party customers who peruse Airbnb's website. Through this agreement with the property owner, Airbnb receives its fee for listing the rental of the property owned or operated by the host. The owner or host of the property was Rising Sun Ranch, having a place of business in Idaho. Airbnb also offers other services to their hosts to facilitate and keep these listings, and Airbnb lists hundreds of properties for rent in the State of Idaho.

In addition, a transaction occurs between the renter/guest and Airbnb itself. Airbnb's website allows users to search for and schedule a stay on a host's property. Airbnb manages the finances that pertain not just to their transaction with the host, but their transaction with the renter or guest as well. Airbnb facilitates the transfer of funds that occurs between the renter and the host, and ultimately receives a fee paid by the renter or guest, in addition to its commission from the host's proceeds.

"[A] party which enters into a business relationship with an Idaho-based business usually will have acted for the purpose of realizing a pecuniary benefit or in furtherance of a business objective, and therefore, transacted business within the state." *Brockett Company*, 168 Idaho at 381, 483 P.3d at 438. Airbnb acknowledges that it enters into an agreement that is transactional

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

in nature with the host—in this case, Rising Sun Ranch. By its terms of service, Airbnb derives a pecuniary benefit from this arrangement, which centers on the use of real property located in Idaho. "A contract is not a requirement for the exercise of personal jurisdiction under Idaho Code section 5-514(a). The out-of-State defendant must merely engage in an act for the purpose of realizing pecuniary benefit or in furtherance of a business purpose." *Id*. at 382, 483 P.3d at 439. Even absent any agreement between Airbnb and the other parties, the facts in the record indicate Airbnb engaged in an act with an Idaho-based business, regarding real property in Idaho, and that such was in furtherance of Airbnb's business purpose: to receive a commission for facilitating listings of private real property for rent. Taken altogether, and viewing the facts in a light most favorable to Plaintiff as the non-movant, the Court concludes that Airbnb transacts business within the meaning of Idaho's long-arm statute.

### 2. Relationship between the Cause of Action and the Business Transacted

"[N]ot just any contacts by the defendant with Idaho . . . will sustain the exercise of specific personal jurisdiction, but only those out of which the suit arises or those that relate to the suit." *Houghland Farms, Inc. v. Johnson*, 119 Idaho 72, 75, 803 P.2d 978, 981 (1990). "We are unwilling to extend section 5-514(a)'s reach to tort causes of action when the cause of action is only tangentially related to the out-of-state defendant's doing of business in Idaho." *Gailey*, 157 Idaho at 731, 339 P.3d at 1135.

To apply Idaho's long-arm statute, the Court must find that Airbnb's Idaho-related activities are more than tangentially related to Plaintiff's alleged injuries. Even construing the facts in a light most favorable to Plaintiff, the Court cannot find more than a tangential relationship between the alleged incident and the business transacted by Airbnb. When considering whether a cause of action truly "arose from" a business transaction that took place

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

between a plaintiff and a defendant, the Supreme Court has previously found that the cause of action did not arise from the transaction, despite the effects of the transaction being felt in Idaho where: (1) the plaintiff is not from Idaho; (2) the defendant is not from Idaho; and (3) the defendant performed the business transaction while (1) and (2) were still true, resulting in the transaction not being directed at Idaho or an Idaho resident. *Gailey*, 157 Idaho at 731, 339 P.3d at 1135; see also *Dickinson Frozen Foods*, 164 Idaho at 677, 434 P.3d at 1283; accord *Brockett Company, LLC*, 168 Idaho at 383, 483 P.3d at 440.

Here, neither Plaintiff nor Airbnb were from Idaho at the time of the alleged injury. It is also true that the injury allegedly caused by the condition of the rented premises certainly has *some* connection to the transaction, because Plaintiff likely would have never been on the property without the transaction. However, the injury was only tangentially related to Plaintiff's transaction with Airbnb and did not "arise" from the transaction itself. Although the effects of this transaction were felt in Idaho, the location where the effects are ultimately felt is not determinative of the long-arm analysis. There is also no allegation or evidence that either of the other Airbnb entities engaged in any transaction related to Plaintiff's claims.

Plaintiff's personal injury claim against the Airbnb entities is merely tangential to Airbnb's relevant Idaho transactions. Therefore, Idaho's long-arm statute is not available to Plaintiff with regard to Airbnb, and the Court will not exercise personal jurisdiction over Airbnb or any of the Airbnb defendants.

### III.     Plaintiff's Rule 56(d) Motion

Plaintiff has moved for additional time to conduct discovery on the jurisdictional issues in order to oppose the Motion to Dismiss. Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition,

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." I.R.C.P. § 56(d).

The Court will note that Plaintiff has made a Rule 56(d) request via a combination of a motion, declarations from Plaintiff's Counsel and Plaintiff, and briefing. Plaintiff's filings must provide "specified reasons" for deferring a ruling on the motion to dismiss or allowing time to take discovery on the jurisdictional issue. No such reasons were provided in Plaintiff's Rule 56(d) Motion, save to "conduct jurisdictional discovery" and "to ascertain additional facts, solely in the possession of Airbnb Defendants." There is also some discussion in Plaintiff's briefing regarding the need to conduct discovery for purposes of understanding Airbnb's relationship with Idaho's Tax Commission or to understand its fee structure in general. However, Plaintiff has not explained how such jurisdictional discovery would relate to the issue of whether or not the alleged injuries arise from the transaction with Airbnb. Specifically, if Airbnb is simply a platform through which guests book property rentals owned by hosts, the transaction between the guest and Airbnb itself appears limited to booking and payment. (Declaration of Melanie Baillie, Ex. 2, Pg. 2). It is difficult to ascertain what further connections could be made in discovery. A sufficient showing of specific reasons has not been made to warrant further discovery on this issue. To the degree that Airbnb acts as a payment collection agent, Plaintiff has not been able to specify how acting in such capacity relates his injury to any transaction made between himself and Airbnb. Taken altogether, there has not been a showing of specific reasons which would persuade the Court to provide Plaintiff with more time to conduct jurisdictional discovery. Plaintiff's Rule 56(d) Motion is denied.

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

## CONCLUSION

Plaintiff's Rule 56(d) motion to allow discovery is DENIED. Defendant's Motion to Dismiss is GRANTED. Plaintiff's claims as to Airbnb and the Airbnb entities are DISMISSED.

IT IS SO ORDERED.

Dated _____8/18/2023 3:27:23 PM_____.

_____
Brent L. Whiting
District Judge

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

# EXHIBIT 5

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

At an IAS Term, Part 66 of the
Supreme Court of the State of New
York, held in and for the County of
Kings, at the Courthouse, at 360
Adams Street, Brooklyn, New York,
on the 6th day of OCTOBER, 2022

P R E S E N T :
HON. RICHARD VELASQUEZ

                  Justice.

--------------------------------------------------------------------X

BRENDAN KING,

                        Plaintiff,

    -against-

PLEASANT 30 LLC, TITANIA RETURNS LLC,
AIRBNB, INC., and "JOHN DOE",

                     Defendants,

--------------------------------------------------------------------X

Index No.: 514353/2021
Decision and Order
Mot. Seq. No. 3

The following *papers NYSCEF Doc #'s*  44  to  74  read on this motion:

| Papers | *NYSCEF DOC NO.'s* |
|---|---|
| Notice of Motion/Order to Show Cause | |
| Affidavits (Affirmations) Annexed_____ | 44-60 |
| Opposing Affidavits (Affirmations)_____ | 61-64; 74 |

After having come before the Court and the Court having heard Oral Argument

on June 22, 2022 the court finds as follows:

Defendant AIRBNB INC. an Order dismissing with prejudice Plaintiff's Verified

Complaint as against Airbnb pursuant to CPLR § 3211(a)(7) for failure to state a cause

of action. Plaintiff opposes the same.

Pursuant to CPLR 3211, the pleading is to be afforded a liberal construction (see,

CPLR 3026). We accept the facts as alleged in the complaint as true, accord plaintiffs

the benefit of every possible favorable inference, and determine only whether the facts

as alleged fit within any cognizable legal theory (*Morone v. Morone*, 50 NY2d 481, 484,

429 NYS2d 592, 413 NE2d 1154; *Rovello v. Orofino Realty Co.*, 40 N.Y.2d 633, 634,

389 NYS2d 314, 357 NE2d 970). **"The criterion is whether the proponent of the**

Page **1** of **3**

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

**pleading has a cause of action, not whether he has stated one"** (*Guggenheimer v. Ginzburg*, 43 NY2d 268, 275, 401 NYS2d 182, 372 NE2d 17; *Rovello v. Orofino Realty Co.*, 40 NY2d at 636, 389 NYS2d 314, 357 NE2d 970). **"[B]are legal conclusions and factual claims which are flatly contradicted by the evidence are not presumed to be true on such a motion"** (*Palazzolo v. Herrick, Feinstein, LLP*, 298 AD2d 372, 751 NYS2d 401). If the documentary proof disproves an essential allegation of the complaint, dismissal pursuant to CPLR 3211(a)(7) is warranted even if the allegations, standing alone, could withstand a motion to dismiss for failure to state a cause of action (see *McGuire v. Sterling Doubleday Enters., LP*, 19 AD3d 660, 661, 799 NYS2d 65). Although a court should sparingly grant a motion to dismiss for failure to state a cause of action, where the affidavits submitted in support of the motion establish conclusively that the plaintiff has no cause of action, the court should grant the motion. *See Doe v Ascend Charter Schs.*, 181 AD3d 648 [2d Dept 2020], *citing Sokol v Leader*, 74 AD3d at 1182 [2d Dept 2010], *quoting Lawrence v Graubard Miller*, 11 NY3d 588, 595, 901 N.E.2d 1268, 873 NYS2d 517 [2008], *quoting Rovello v Orofino RealtyCo.*, 40 NY2d at 636 [1976]. *See also, Porat v Rybina*, 177 AD3d 632 [2d Dept 2019].

In the present case Plaintiff asserts two unnamed causes of action against defendants stemming from an alleged injury he suffered jumping a fence. Although unnamed, Plaintiff's claims sound in (i) premises liability and (ii) negligence pursuant to N.Y. Gen. Mun. Law § 205-e and N.Y. Gen. Oblig. Law § 11-106. New York employs notice pleading—the allegations of a complaint need be only "sufficiently particular to give the court and parties notice of the . . . occurrence . . .intended to be proved." CPLR § 3013.

Plaintiff's complaint fails to meet this liberal pleading standard. The complaint

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

consists of conclusory allegations and fails to allege any facts establishing Airbnb's liability. Plaintiff repeats the same vague and conclusory assertions that "defendants," collectively, were negligent and careless in maintaining the premises. See NYSCEF Doc No. 34. Specifically, Plaintiff's claims require alleging Airbnb had some ownership, control, or possession of the subject premises. Airbnb is a website—an online platform—that connects individuals who wish to offer accommodations ("Host(s)") with those seeking to book accommodations, nothing more. Airbnb's Terms of Service ("TOS"), affirm this point, and explicitly state that Airbnb does not own, offer, control, or manage the properties listed on its platform and makes no representations or warranties about their safety, suitability, or condition. Thus, Airbnb is not an owner of nor has any control over the properties listed on its platform and cannot be liable for negligence or premises liability. As plaintiff has not alleged that AIRBNB had some ownership, control, or possession of the subject premises its claims against AIRBNB must be dismissed for failure to state a cause of action.

Accordingly, AIRBNB did not own operate manage, control maintain or supervise the property in question where this accident allegedly occurred. AIRBNB owed no duty to the plaintiff. As such AIRBNB's motion to dismiss is hereby granted as to AIRBNB. This matter is dismissed as against AIRBNB.

This constitutes the Decision/Order of the court.

Dated:     Brooklyn, New York
           October 6, 2022

ENTER FORTHWITH:

HON. RICHARD VELASQUEZ

Hon. Richard Velasquez, JSC

OCT 06 2022

Page **3** of **3**

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

# EXHIBIT 6

COPY

## *Airbnb, Inc. v. City & Cnty. of San Francisco*

United States District Court for the Northern District of California

November 8, 2016, Decided; November 8, 2016, Filed

Case No. 3:16 -cv-03615-JD

**Reporter**

217 F. Supp. 3d 1066 *; 2016 U.S. Dist. LEXIS 155039 **; 2016 WL 6599821

AIRBNB, INC., et al., Plaintiffs, v. CITY AND COUNTY OF SAN FRANCISCO, Defendant.

**Subsequent History:** As Corrected September 7, 2022.

Injunction granted at *Airbnb, Inc. v. City & County of San Francisco, 2016 U.S. Dist. LEXIS 160451 (N.D. Cal., Nov. 18, 2016)*

## Core Terms

Ordinance, hosts, rental, plaintiffs' listings, publisher, preemption, Booking, registration, registered, advertising, online, regulation, short-term, Platforms, Internet, postings, injunction, lawfully, website, preliminary injunction, unregistered, user, third party, restrictions, provider, cases, commercial speech, third-party, transactions

**Counsel:** [**1] For Airbnb, Inc., Plaintiff: Ellen Medlin Devereux Richmond, LEAD ATTORNEY, Munger, Tolles and Olson, San Francisco, CA; John Willson Spiegel, LEAD ATTORNEY, Munger Tolles & Olson, Los Angeles, CA; Joshua Patashnik, LEAD ATTORNEY, Munger, Tolles and Olson LLP, San Francisco, CA; John B. Major, Munger, Tolles Olson LLP, San Francisco, CA; Jonathan Hugh Blavin, Attorney at Law, Munger, Tolles & Olson, LLP, San Francisco, CA.

For HomeAway.com, Inc., Intervenor Pla: Ambika Kumar Doran, James C. Grant, Thomas John Wyrwich, PRO HAC VICE, Davis Wright Tremaine LLP, Seattle, WA; Sanjay Mohan Nangia, Davis Wright Tremaine LLP, San Francisco, CA.

For City and County of San Francisco, Defendant: Tara M. Steeley, LEAD ATTORNEY, San Francisco City Attorney's Office, San Francisco, CA; James Moxon Emery, City Attorney's Office, City of San Francisco, San Francisco, CA.

For The Internet Association, CALinnovates, Amicuses: Andrew P. Bridges, LEAD ATTORNEY, Fenwick & West LLP, San Francisco, CA.

For Electronic Frontier Foundation, Amicus: David A Greene, LEAD ATTORNEY, Electronic Frontier Foundation, San Francisco, CA.

For Center for Democracy and Technology, Daphne Keller, Eric Goldman, Eugene Volokh, [**2]  Amicuses: David A Greene, Electronic Frontier Foundation, San Francisco, CA.

**Judges:** JAMES DONATO, United States District Judge.

**Opinion by:** JAMES DONATO

## Opinion

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

**[*1069] ORDER RE PRELIMINARY INJUNCTION**

Re: Dkt. No. 50

Plaintiffs Airbnb, Inc. ("Airbnb") and HomeAway, Inc. ("HomeAway") seek a preliminary injunction barring enforcement of a City and County of San Francisco ordinance that makes it a misdemeanor to provide booking services for unregistered rental units. The parties agreed that an evidentiary hearing was not necessary and the Court took oral argument on the motion on October 6, 2016. The injunction is denied on the primary grounds urged by plaintiffs, but further proceedings are warranted on an issue relating to fair enforcement.

**BACKGROUND**

This case arises out of San Francisco's effort to regulate aspects of the "sharing economy" for accommodation rentals. Airbnb is a San Francisco-based company that operates an Internet website through which "guests" can connect with "hosts" to enter into agreements to rent accommodations on a short- or long-term basis. Dkt. No. 50 at 3; Dkt. No. 52 ¶¶ 1, 2. Airbnb does not own, manage or operate any of the host properties, and is not a party to the rental agreements. Dkt. No.████50 at 3; Dkt. No. 52 ¶ 4. It does not charge an upfront fee for hosts to post a listing on its website, and does not run banner ads or other forms of advertising next to the listings. Dkt. No. 52 ¶ 9; Dkt. No. 72 at 18:5-6. Airbnb makes money by charging hosts and guests a service fee that is a percentage based on the cost of the rental. Dkt. No. 52 ¶ 8. Airbnb has been phenomenally successful nationally and internationally since its inception in 2008. HomeAway also features an Internet website that operates in part on the same business model. Dkt. No. 72 at 4:11-14.

**[*1070]** An important feature of plaintiffs' websites is that content for the rental listings is driven entirely by hosts. Dkt. No. 52 ¶ 7; Dkt. No. 72 at 18:13-15. The posting process is automated and requires the host to fill in some required fields, but plaintiffs do not verify, review or edit the information provided by the host, and do not contribute content of their own to the listing. Dkt. No. 52 ¶ 7; Dkt. No. 72 at 17:2-25.

The ordinance plaintiffs challenge is San Francisco's most recent approach to regulating short-term rentals. Between 1981 and 2014, San Francisco effectively banned "tourist or transient" rentals out of **[**4]** concerns over losing affordable permanent housing stock. Dkt. No. 57 at 2. In 2015, San Francisco changed course and enacted Ordinance 218-14, which lifted the ban and provides "an exception for permanent residents to the prohibition on short-term residential rentals under certain conditions." *Id.* One of the main conditions is that a host register a residence with San Francisco before making it available as a short-term rental. *Id.*; Dkt. No. 60-1 Exh. A. Registration requires proof of liability insurance and compliance with municipal codes, usage reporting, tax payments and other conditions. Dkt. No. 49 ¶¶ 30, 31. San Francisco also enacted Ordinance 130-15 to create the Office of Short-Term Residential Rental Administration and Enforcement ("OSTR"), which administers the registration and other requirements. Dkt. No. 57 at 3; Dkt. No. 60 ¶ 6.

Taken together, these ordinances broke new ground in San Francisco by legalizing short-term rentals of properties that are registered with the OSTR. Plaintiffs do not challenge Ordinance 218-14 or Ordinance 130-15 in any way, and they agree that a residential unit must be lawfully registered before being rented on a short-term basis. Dkt. No. 72 **[**5]** at 14:21-15:1; *see generally* Dkt. Nos. 50, 64.

According to San Francisco, compliance with the registration requirement has been spotty. Dkt. No. 57 at 4. As of November 2015, for example, San Francisco had received only 1,082 short-term rental registration applications while Airbnb listed 5,378 unique short-term rental hosts in San Francisco, which points to a registration rate of just 20% even without including HomeAway and other similar services. *Id.*; Dkt. No. 51-7 at 14. By March 2016, the ratio was 1,647 registered out of 7,046 listed -- a registration rate of approximately 25%. Dkt. No. 57 at 4; Dkt. No. 51-7 at 14. In April 2016, San Francisco's Budget and Legislative Analyst's Office reported that enforcement of the registration requirement was "hampered by the City's lack of information" because short-term rentals "operate in

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

private residences without any commercial signage posted" and because hosting platforms "do not disclose addresses or booking information about their hosts." Dkt. No. 51-7 at 7.

In an apparent response to this situation, San Francisco enacted Ordinance 104-16 (the "Original Ordinance"), which amended Chapter 41A of the Administrative Code. Dkt. No. 51-1. ████ As San Francisco acknowledges, this ordinance directly touched upon content posted on the Internet by imposing requirements designed to prevent the publication of listings for rentals that were not lawfully registered. Dkt. No. 57 at 4. In effect, this ordinance would have required companies like plaintiffs to actively monitor and verify content provided by third-party hosts before publication, at the peril of being held criminally and civilly liable if a listing for an unregistered unit was published on their websites. *See* Dkt. No. 51-1 at 3-5.

Promptly after the Original Ordinance was enacted in June 2016, Airbnb filed this lawsuit and moved for a preliminary injunction. Dkt. Nos. 1, 3. HomeAway was ████████ granted leave to intervene as a plaintiff. Dkt. No. 35. But as the Court prepared to launch the injunction proceedings, San Francisco requested a stay to allow the Board of Supervisors to consider proposed amendments that might "significantly alter plaintiffs' obligations under San Francisco law." Dkt. No. 31-1; Dkt. No. 36.

On August 2, 2016, the Board of Supervisors passed Ordinance 178-16 (the "Ordinance"), which is the law at issue in this lawsuit. Dkt. No. 57 at 4-5; Dkt. No. 58-████ Exh. C. Although styled as an amendment of the Original Ordinance, the Ordinance is significantly different from its predecessor and in practical measure amounts to a new law. Of particular import here, it abandons any requirements or restrictions on the publication of a rental listing. *Compare* Dkt. No. 51-1 at 4 *with* Dkt. No. 50-2 at 3-4. The Ordinance makes it a misdemeanor to collect a fee for providing booking services for the rental of an unregistered unit. Dkt. No. 50-2 at 3-4. It became law without the Mayor's signature on August 11, 2016. Dkt. No. 40 at 1.

The operative terms and definitions of the Ordinance are critical to the resolution of the injunction motion, and deserve close attention. As an initial matter, the Ordinance defines a "Booking Service" in pertinent part as "any reservation and/or payment service provided by a person or entity that facilitates a short-term rental transaction between an Owner . . . and a prospective tourist or transient user . . . for which the person or entity collects or receives . . . a fee in connection with the reservation and/or payment services." Dkt. No. 50-2 at 2. It defines a "Hosting Platform" as a "person or entity that participates ████ the short-term rental business by providing, and collecting or receiving a fee for, Booking Services." *Id.* The Ordinance expressly states that a Hosting Platform includes more than just "an online platform" and encompasses non-Internet based services as well. *Id.* Drawing these elements together, the Ordinance permits a Hosting Platform to "provide, and collect a fee for, Booking Services in connection with short-term rentals for Residential Units located in the City and County of San Francisco only when those Residential Units are lawfully registered on the Short Term Residential Rental Registry" at the time of rental. *Id.* at 3-4. The OSTR interprets "lawfully registered" to mean that a host has obtained a registration number from the OSTR. Dkt. No. 60 ¶ 12. A violation constitutes a misdemeanor punishable by a fine of up to $1,000 and imprisonment for up to six months. Dkt. No. 50-2 at 2-3. The Ordinance also imposes reporting and other requirements, but the Booking Service terms and provisions are at the heart of plaintiffs' lawsuit.

On August 17, 2016, San Francisco filed a "Notice of Completion of Amendment Process" and took the position that the litigation should proceed. Dkt. No. 40. At a status conference on August 22, 2016, **[**9]** San Francisco agreed to stay enforcement of the Ordinance pending the Court's disposition of plaintiffs' renewed preliminary injunction motion. Dkt. No. 44. Plaintiffs jointly filed the renewed motion on September 6, 2016. Dkt. No. 50.

Plaintiffs challenge the Ordinance on three main grounds: (1) "preemption" under the *Communications Decency Act, 47 U.S.C. § 230* ("CDA"); (2) content-based speech restriction under the *First Amendment to the United States Constitution*; and (3) imposition of criminal strict liability. *See generally* Dkt. Nos. 49, 50.

## DISCUSSION

## I. Preliminary Injunction Standards

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, [\*1072] Inc., 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011)* (quoting *Winter, 555 U.S. at 20*). Our circuit applies a "sliding scale" approach in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.; see also Arc of California v. Douglas, 757 F.3d 975, 983 (9th Cir. 2014)*. But "at an irreducible minimum," the party seeking an injunction "must [\*\*10] demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Pimentel v. Dreyfus, 670 F.3d 1096, 1105-06 (9th Cir. 2012)* (internal quotation omitted).

## II. Likelihood of Success on the Merits

### A. *CDA Section 230(c)*

Plaintiffs' lead argument is that the Ordinance is preempted by the CDA. Dkt. No. 50 at 10. *Section 230(c)(1) of the CDA* states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." The CDA includes an express preemption clause, which provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *47 U.S.C. § 230(e)(3)*.

Our circuit holds that *Section 230(c)(1)* precludes liability for claims involving "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Doe v. Internet Brands, Inc., 824 F.3d 846, 850 (9th Cir. 2016)* (internal quotation omitted). There is no dispute in this case that plaintiffs provide an interactive computer service or that the information in their rental listings comes directly and exclusively from third-party users. Consequently, plaintiffs' *Section 230* challenge ███ turns on whether the Ordinance "inherently requires the court to treat" them as "the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1102 (9th Cir. 2009)*.

Plaintiffs' argument is straightforward. In their view, the threat of a criminal penalty for providing and receiving a fee for Booking Services for an unregistered unit requires that they actively monitor and police listings by third parties to verify registration. Plaintiffs contend that is tantamount to treating them as a publisher because it involves the traditional publication functions of "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.; see also Fair Housing Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1170-71 (9th Cir. 2008)* (en banc) (any activity "that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under *section 230*").

But the Ordinance does not threaten the liability plaintiffs fear. As the text and plain meaning of the Ordinance demonstrate, it in no way treats plaintiffs as the publishers or speakers of the rental listings provided by hosts. It does not regulate what can or cannot be said or posted in the listings. It creates no obligation on plaintiffs' part to monitor, edit, withdraw or block ███ the content supplied by hosts. To [\*███ the contrary, as San Francisco has emphasized in its briefs and at oral argument, plaintiffs are perfectly free to publish any listing they get from a host and to collect fees for doing so -- whether the unit is lawfully registered or not -- without threat of prosecution or penalty under the Ordinance. Dkt. No. 57 at 9; Dkt. No. 72 at 25:20-24. The Ordinance holds plaintiffs liable only for their own conduct, namely for providing, and collecting a fee for, Booking Services in connection with an unregistered unit. Dkt. No. 50-2 at 3; Dkt. No. 57 at 9. This regulation of plaintiffs' own conduct "does not depend on

EFILED 04/29/24 03:57 PM CASE NO. 23C2812 Joseph P. Day, Clerk

who 'publishes' any information or who is a 'speaker.'" *City of Chicago, Ill. v. Stubhub!, Inc., 624 F.3d 363, 366 (7th Cir. 2010)* (rejecting *Section 230(c)* challenge to municipal tax on Internet auction sites).

Plaintiffs recognize that the Ordinance is not, on its face, directed to content or speech. Dkt. No. 72 at 8:25-9:11. In an effort to surmount that hurdle, plaintiffs reel off a long list of federal and state cases that have broadly applied *Section 230(c)*. Dkt. No. 50 at 10-18. While it is certainly true that these cases found preemption, they are all readily distinguishable from the facts here. The cases plaintiffs rely on involved [**13] claims and regulations that would have imposed liability on the service provider as a publisher or speaker of content supplied by a third party. In *Backpage.com, LLC v. McKenna, 881 F. Supp. 2d 1262, 1266-68 (W.D. Wash. 2012)*, for example, the plaintiff was "the second largest online advertising service" in the country, and challenged a Washington state law that made it a felony offense to display content advertising or offering the sexual abuse of a minor. In that circumstance, where the crime expressly consisted of an act of publication, the court had no trouble finding preemption because the state law would necessarily hold Backpage.com liable for publishing advertising content supplied by third parties. *Id. at 1273*. The same result was reached in *Goddard v. Google, No. C 08-2738 JF (PVT), 2008 U.S. Dist. LEXIS 101890, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)*. The plaintiff there sought to hold Google liable for injuries from "clicking on web-based advertisements" hosted by Google. *2008 U.S. Dist. LEXIS 101890, [WL] at *1*. The court found that "[p]laintiff claims in essence that she was harmed because Google hosted certain online content" and that her claims "would effectively hold Google liable for its publication of third-party content in contravention of *§ 230*." *2008 U.S. Dist. LEXIS 101890, [WL] at *5*. In *Doe v. Backpage.com, LLC, 817 F.3d 12, 16 (1st Cir. 2016)*, victims of child sex trafficking sought to hold Backpage.com liable because its "rules and processes governing the content of advertisements ▮▮▮▮ are designed to encourage sex trafficking." The First Circuit found that these claims "[w]ithout exception" encompassed Backpage's editorial and publication "decisions about how to treat postings" by third parties, and were therefore precluded. *Id. at 21-22*. In addition, the First Circuit appears to take a more expansive view of *Section 230(c)* preemption than the Ninth Circuit. In another case plaintiffs cite involving Backpage.com, the law at issue expressly criminalized the sale of or the offer to sell an advertisement for commercial sexual abuse of a minor. *Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805, 816-17 (M.D. Tenn. 2013)*.

Plaintiffs' other case citations are inapposite for the same reason -- they all turned on facts showing that the service provider would necessarily be held liable as the publisher or speaker of online content provided by another. Much more germane, and of course controlling, are the Ninth Circuit's recent decisions denying preemption under *Section 230(c)*. These cases acknowledge Congress's goals in [▮▮▮▮▮ *Section 230(c)* "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material," and to preserve the "vibrant and competitive free market" for interactive computer services. *Barnes, 570 F.3d at 1099-1100* (internal quotation omitted). But ▮▮▮▮ they also hold, contrary to plaintiffs' position, that *Section 230(c)* does not provide limitless immunity for online activity or conduct related to it. Congress enacted *Section 230* primarily "to protect websites against the evil of liability for failure to remove offensive content." *Roommates.com, 521 F.3d at 1174*. *Section 230(c)* does not create "a general immunity from liability deriving from third-party content." *Barnes, 570 F.3d at 1100*; *see also City of Chicago, 624 F.3d at 366* (same). "To 'provid[e] immunity every time a website uses data initially obtained from third parties would eviscerate [the statute].'" *Barnes, 570 F.3d at 1100* (quoting *Roommates.com, 521 F.3d at 1171*)(brackets in original).

The correct test, then, is not whether a challenged activity merely bears some connection to online content. It is whether a regulation or claim "inherently requires the court to treat" the "interactive computer service" as a publisher or speaker of information provided by another. *Barnes, 570 F.3d at 1102*. Applying this test, our circuit has denied preemption when a regulation or claim does not turn on holding an Internet service liable for posting or failing to remove content provided by a third party. *Internet Brands, 824 F.3d at 851* (denying preemption of duty to warn relating to defendant's online practices); *see also Barnes, 570 F.3d at 1107* (denying preemption of promissory estoppel claim relating to online postings because "Barnes does not seek [**16] to hold Yahoo liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract"). So too here, where the challenged Ordinance regulates plaintiffs' own conduct as Booking Service providers and cares not a whit about what is or is not featured on their websites.

Plaintiffs' other main CDA argument draws on a preemption decision far removed from the *CDA and Section 230(c)*. Plaintiffs argue that a 2012 Supreme Court opinion, *Nat'l Meat Ass'n v. Harris, 565 U.S. 452, 132 S. Ct. 965, 181 L. Ed. 2d 950 (2012)*, sets a general rule that a preemption analysis must assess the "practical effect" of the challenged ordinance and how it "operates in fact" to determine whether it runs afoul of a bar. Dkt. No. 64 at 8; Dkt. No. 72 at 8:4-12. In that case, the Supreme Court struck down a California state law that imposed criminal penalties on slaughterhouses for selling products from nonambulatory animals for human consumption. *National Meat Ass'n, 132 S.Ct. at 975*. It held that the *Federal Meat Inspection Act* ("FMIA") broadly preempts state laws that purport to impose any additional or different standards on slaughterhouse facilities or operations, including the handling of nonambulatory animals. *Id. at 970-71*. The federal statute did not explicitly refer to sales activities, and proponents of the California law ██████ tried to avoid preemption by saying it regulated only those practices. *Id. at 972*. But the Court disagreed. It held that the "inevitable effect" of the sales ban "is to make sure that slaughterhouses remove nonambulatory pigs" from their operations. *Id.* Allowing that to stand would "make a mockery of the FMIA preemption provision." *Id. at 972-73*.

Plaintiffs argue that this same reasoning applies here. While they acknowledge that the Ordinance does not on its face treat them as publishers or speakers of third party content, Dkt. No. 72 at 8:25-9:11, they insist that it will have the practical effect of compelling them to monitor listings and remove postings for unregistered ██████] rentals. Dkt. No. 64 at 11; Dkt. No. 72 at 14:6-16. They point to the sequence of events leading up to the Ordinance as suggestive evidence. Dkt. No. 50 at 6-7. The Original Ordinance would have treated plaintiffs as liable for content provided by users; San Francisco withdrew that law essentially as a concession that it would not survive review under *Section 230(c)*. *Id.* The current Ordinance, in plaintiffs' view, is designed to achieve the same impermissible end through indirect means. Dkt. No. 50 at 19; Dkt. No. 64 at 1.

This argument is not well taken. ██████ As an initial matter, plaintiffs raised *National Meat* for the first time in a reply brief, and a case can be made that the Court should decline to consider it for that reason alone. *United States v. Romm, 455 F.3d 990, 997 (9th Cir. 2006)*; *FT Travel -- New York, LLC v. Your Travel Center, Inc., 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015)*. The Court addresses it anyway for the sake of completeness and because the risk that plaintiffs have unfairly sandbagged San Francisco is not substantial.

Plaintiffs' problem is that they have failed to submit evidence showing that the Ordinance will in fact inevitably or perforce require them to monitor, remove or do anything at all to the content that hosts post. Airbnb says the Ordinance will make screening listings for registration status "very likely" but stops short of saying that it would be a necessity. Dkt. No. 52 ¶ 25. Plaintiffs might indeed voluntarily choose to screen listings, and the facts show that Airbnb already reviews and "discretionarily removes listings" for other reasons. *Id.* ¶ 14. But the Ordinance does not compel that result. It may be equally likely that plaintiffs will consider other measures unrelated to editing user content, such as posting a notice to users that they can provide Booking Services in San Francisco only for units that are lawfully registered an ██████ verified as such. *See Internet Brands, 824 F.3d at 851* (approving warning notice on website). Or they may consider charging fees for publishing listings, rather than for facilitating transactions -- a measure San Francisco concedes is lawful. *See* Dkt. No. 57 at 14 ("Under the Ordinance, Hosting Platforms are free to charge a fee for posting a listing (even a listing for an unregistered unit) on their websites."). The record before the Court simply does not support a finding that the Ordinance will inevitably or necessarily treat plaintiffs as publishers or speakers of user content, or force them to edit or remove postings.

Plaintiffs also slight the fact that preemption under the FMIA is different from and potentially much broader than under *Section 230(c)*. *Compare* CDA, *47 U.S.C. § 230(e)(3)* ("No cause of action may be brought and no liability may be imposed under any State or local law that is *inconsistent* with this section.") (emphasis added) *with* FMIA, *21 U.S.C. § 678* (barring a state from imposing requirements "in addition to, or different than . . . requirements within the scope" of the FMIA -- even if the requirements do not conflict). It is the scope of *Section 230(c)* that governs here, and the Ninth Circuit has expressly cautioned against applying it "beyond its narrow [████] language and its purpose." *Internet Brands, 824 F.3d at 853*. Requirements that might have an incidental ripple effect on Internet postings are not barred under the CDA. "Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet" even when a claim "might have a marginal chilling effect on internet publishing businesses." *Id.*

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

Other factors also counsel against plaintiffs' reading of *National Meat*. Cases that have construed *National Meat* in contexts outside the FMIA have limited it to its particular facts. The Second Circuit, for example, declined to apply it to find preemption ████ of a New York state law regulating the sale of certain tobacco products. *See U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York, 708 F.3d 428, 434 (2d Cir. 2013)*. The circuit held that "it does not follow that every sales ban . . . should be regarded as a backdoor" attempt to regulate conduct upstream from the actual sale of goods or services. *Id.* In addition, the broad reading of *National Meat* that plaintiffs urge would give them a windfall over potential competitors. The Ordinance is intended to apply to all hosting services, whether online or not. Dkt. No. 50-2 at 2. Plaintiffs' backdoor argument under *Section 230(c)* would carve out favorable treatment for themselves, a ████ online companies, that booking service providers not based on the Internet would not enjoy. *See Roommates.com, 521 F.3d at 1164 n.15* (CDA immunity should not be applied to "give online businesses an unfair advantage over their real-world counterparts").

Plaintiffs have not demonstrated a likelihood of success or a serious question on preemption under *Section 230(c)*. Consequently, an injunction is denied on that ground.

### B. *First Amendment*

Plaintiffs also challenge the Ordinance under the *First Amendment*. Plaintiffs say the Ordinance triggers *First Amendment* scrutiny because its practical effect will be to burden speech, and that it is subject to "heightened" scrutiny because it restricts particular content, namely advertisements for unlawfully registered rentals. Dkt. No. 50 at 20-22; Dkt. No. 72 at 18:22-25. These contentions are unavailing.

The initial inquiry under the *First Amendment* is whether the Ordinance primarily targets speech or speakers, or is better construed as an economic regulation. "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct," and "the *First Amendment* does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc., 564 U.S. 552, 567, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011)*. Consequently, as our circuit has held, the "threshold question ████ is whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n, Inc. v. City of Seattle, 803 F.3d 389, 408 (9th Cir. 2015)* (quoting *Arcara v. Cloud Books, Inc., 478 U.S. 697, 706-07, 106 S. Ct. 3172, 92 L. Ed. 2d 568 (1986))*.

Plaintiffs have not demonstrated that the Ordinance meets either of these threshold conditions. A Booking Service as defined and targeted by the Ordinance is a business transaction to secure a rental, not conduct with a significant expressive element. *See Int'l Franchise Ass'n, 803 F.3d at 408* ("decision of a franchisor and a franchisee to form a business relationship and their resulting business activities" not expressive conduct). The Ordinance also does not single out those engaged in expressive activity "such as newspapers or advocacy organizations." *Id.* No specific speaker is targeted for disparate or unfavorable treatment under the Ordinance. Although the Ordinance does note that Hosting Platforms are "usually" online platforms, the law is not limited to entities operating on the Internet. Dkt. No. 50-2 at 2. And plaintiffs have not established that the Ordinance was "motivated by a desire to suppress speech." *Int'l Franchise Ass'n, 803 F.3d at 409*. The legislative record plaintiffs present indicates that the Ordinance was adopted to help enforce compliance with ████ the registration requirement by ensuring that "hosting platforms do business with law-abiding hosts." *See, e.g.*, Dkt. No. 51-3 at 1 (legislative remarks of Supervisor ████ Campos). In light of these factors, the Court finds that the Ordinance is directed at specific business transactions and practices, and "not to any message the businesses express." *Int'l Franchise Ass'n, 803 F.3d at 409*.

Plaintiffs contend that two Supreme Court cases require a different outcome: *Sorrell, 564 U.S. at 564*, which struck down a Vermont statute that restricted the sale, disclosure and use of pharmacy records revealing doctors' drug prescribing practices so that "recipient speakers" such as pharmaceutical companies could not receive or "use the information for marketing"; and *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991)*, which invalidated a New York statute, the "Son of Sam" law, that would

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk

COPY

have restricted a criminal's right to profit from literary or other works based on the crime. But neither case leads to the result plaintiffs seek. The Vermont law in *Sorrell* on its face "disfavor[ed] marketing, that is, speech with a particular content," and "[m]ore than that, . . . disfavor[ed] specific speakers, namely pharmaceutical manufacturers." *564 U.S. at 564*. Consequently, the Supreme Court found that those were "content- and speaker-based" restrictions that ▆▆▆ did not withstand *First Amendment* scrutiny. *Id. at 563-80*. The New York law in *Simon & Schuster* was also a "content-based statute" because it singled out income derived from classically "expressive activity" (*e.g.*, books, movies, magazine articles, or other "expression[s] of [an] accused or convicted person's thoughts, feelings, opinions or emotions" about the crime), and was directed only at "works with a specified content" (*i.e.*, relating to the "reenactment of [the] crime"). *502 U.S. at 110, 116*. These core *First Amendment* concerns are not implicated by the Ordinance here.

Plaintiffs' other citations are similarly inapposite. *Reed v. Town of Gilbert, Arizona, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015)*, for example, invalidated under the *First Amendment* a municipal code that imposed disparate restrictions on the display of outdoor signs based on the speech content of the signs. Signs expressing "political" messages or directing passersby to religious, charitable or other non-profit organization events were subjected to different and more burdensome regulations than other signs. *Id. at 2224-25*. The Court invalidated this "Sign Code" under strict scrutiny precisely because it improperly imposed "content-based restrictions on speech." *Id. at 2231-32*. Similarly, the Supreme Court in *Bigelow v. Virginia, 421 U.S. 809, 95 S. Ct. 2222, 44 L. Ed. 2d 600 (1975)*, struck down a Virginia law that "made it a misdemeanor, by the sale or circulation of any publication, [**25] to encourage or prompt the procuring of an abortion." *Id. at 811*. And, as previously discussed, *McKenna, 881 F. Supp. 2d at 1268*, addressed a Washington law that made it a felony to publish, disseminate, or display advertisements for a commercial sex act "that includes the depiction of a minor." The common denominator in these and the other cases plaintiffs have proffered is that they involved laws that plainly targeted and disfavored specific speech content or speakers. The law in this case stands apart as one that targets nonexpressive commercial conduct rather than speech content.

Plaintiffs' fallback position is that the Ordinance is a restriction on speech in the "disguise" of a conduct regulation. Dkt. No. 50 at 21; Dkt. No. 64 at 10-11. But this argument is little more than an expression of the widely recognized condition that speech and conduct fall on a continuum, and a law that affects one will often affect the other. "Every civil and criminal ▆▆▆ remedy imposes some conceivable burden on *First Amendment* protected activities." *Arcara, 478 U.S. at 706* (citing as an example that "a thief who is sent to prison might complain that his *First Amendment* right to speak in public places has been infringed because of the confinement"); *see also Barnes, 501 U.S. at 570* ("It is possible to find some kernel ▆▆▆ expression in almost every activity a person undertakes -- for example, walking down the street or meeting one's friends at a shopping mall -- but such a kernel is not sufficient to bring the activity within the protection of the *First Amendment*."). It does not follow, then, that every sanction under a law is subject to *First Amendment* scrutiny "simply because each particular remedy will have some effect on the *First Amendment* activities of those subject to sanction." *Arcara, 478 U.S. at 706*. Unlike the cases plaintiffs cite, the Ordinance here enacts "restrictions directed at commerce or conduct," namely the booking of rentals for unregistered units. *Sorrell, 564 U.S. at 567*. To the limited extent the Ordinance might be said to affect speech, the impact or burden is purely incidental. *Id.* Because the Ordinance "was not motivated by a desire to suppress speech, the conduct at issue is not . . . expression, and the ordinance does not have the effect of targeting expressive activity," *Int'l Franchise Ass'n, 803 F.3d at 409*, the *First Amendment* is "not implicated" at all. *Arcara, 478 U.S. at 707*.

This is enough to end plaintiffs' *First Amendment* challenge, but even if the Ordinance is reviewed as a restriction on commercial speech, it survives scrutiny. To the extent the Ordinance can be said to affect speech at all, it involves speech that "does no more than propose ▆▆▆] a commercial transaction" and consequently is "commercial speech." *Lone Star Security and Video, Inc. v. City of Los Angeles, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016)* (internal quotation omitted). Plaintiffs agree with this approach. Dkt. No. 50 at 21.

As a preliminary matter to the commercial speech discussion, the parties dispute the appropriate level of scrutiny. Our circuit recently resolved this issue by reaffirming after publication of *Reed* and *Sorrell* that commercial speech, even if content-based, need only withstand intermediate scrutiny under *Central Hudson Gas & Elec. Corp. v. Public*

*Serv. Comm'n of New York, 447 U.S. 557, 564, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)*. *See Lone Star, 827 F.3d at 1198 n.3*. In any event, the level of scrutiny does not drive the *First Amendment* analysis here. Our circuit applies a four-part test from *Central Hudson* to decide commercial speech challenges, and the "threshold requirement" is that the speech must be related to lawful activity. *Valle Del Sol Inc. v. Whiting, 709 F.3d 808, 816 (9th Cir. 2013)* ("we first evaluate whether the affected speech is misleading or related to unlawful activity."). If it is not, the commercial speech at issue is not protected by the *First Amendment* and no further analysis is required. *Id. at 820-21*.

*Central Hudson*'s legality requirement has "traditionally focused on the content of the affected speech -- i.e., whether the speech proposes an illegal transaction." *Valle Del Sol, 709 F.3d at 821*. This is so because the Supreme Court has consistently held that speech proposing an illegal transaction is excluded [**28] from *First Amendment* protection. *See United States v. Williams, 553 U.S. 285, 297, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008)*; *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 388-89, 93 S. Ct. 2553, 37 L. Ed. 2d 669 (1973)* ("Any *First Amendment* interest which might be served by advertising an ordinary commercial  **[*1079]** proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity."). Consequently, the determinative question is "whether 'the transactions proposed in the forbidden [communication] are themselves illegal in any way.'" *Valle Del Sol, 709 F.3d at 821* (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 772, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976)*). If they are, the speech is unprotected and the government may freely regulate it. *Fla. Bar v. Went For It, Inc., 515 U.S. 618, 623-24, 115 S. Ct. 2371, 132 L. Ed. 2d 541 (1995)*; *Washington Mercantile Ass'n v. Williams, 733 F.2d 687, 691 (9th Cir. 1984)* (affirming state ban on advertisements for drug paraphernalia when sale of paraphernalia is illegal).

These well-established principles forestall plaintiffs' argument. As plaintiffs expressly agree, it is illegal in San Francisco to rent a unit that is not lawfully registered. Dkt. No. 72 at 14:21-15:1. They cannot seek, then, to set aside on *First Amendment* grounds an ordinance that they contend would restrict their ability to communicate offers to rent unregistered units. Plaintiffs' reply arguments do not point to a different outcome. For example, plaintiffs quote *McKenna, 881 F. Supp. 2d at 1281*, for the proposition that "[t]he third-party ██ publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of *First Amendment* protection." Dkt. No. 64 at 11. But in *Pittsburgh Press*, the Supreme Court expressly stated that "[w]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes." *413 U.S. at 388*. Plaintiffs also contend that "*First Amendment* scrutiny [is] required unless 'the ad on its face' is unlawful." Dkt. No. 64 at 11 (quoting *Braun v. Soldier of Fortune Magazine, Inc., 968 F.2d 1110, 1117-18 (11th Cir. 1992))*. But *Braun* does not stand for that proposition. In that case, the Eleventh Circuit held that, as a matter of state tort law, it was appropriate to impose liability only if an advertisement "on its face" would have alerted the publisher of the proposed illegality. *968 F.2d at 1118*. As a matter of *First Amendment* law, however, the court confirmed that "[i]t is well-settled that the *First Amendment* does not protect commercial speech 'related to illegal activity,' and, thus, there is no constitutional interest in publishing personal service ads that solicit criminal activity." *Id. at 1117* (citations omitted).

Plaintiffs also make a cursory argument in their reply brief that the Ordinance offends the *First Amendment* because it requires Hosting Platforms [**30] to file a monthly declaration of compliance with the Ordinance and to keep records of facilitated transactions. Dkt. No. 50 at 21. This is unpersuasive. The filing and records requirements relate solely to business transactions. They do not regulate or restrict any speech (*e.g.*, there is no requirement that Hosting Platforms keep records of listings they publish) or any speaker based on the content or views expressed, and so do not trigger any *First Amendment* concerns.

Plaintiffs have not demonstrated a likelihood of success or a serious question under the *First Amendment*. Consequently, an injunction is denied on that ground.

**C. Imposition of Criminal Strict Liability**

COPY

EFILED 04/29/24 03:57 PM  CASE NO. 23C2812  Joseph P. Day, Clerk